BIODIVERSITY ASSOCIATES, a Wyoming non-profit corporation, Friends of the Bow, an unincorporated Wyoming organization, and Leila Bruno, an individual, Plaintiffs,

v.

UNITED STATES FOREST SERVICE DEPARTMENT OF AGRICULTURE, a Federal agency, United States Forest Service Rocky Mountain Regional Forester, in his official capacity, United States Forest Service Medicine Bow National Forest Supervisor, in her official capacity, Defendants,

and

INTERMOUNTAIN FOREST ASSOCIATION, an Idaho non-profit corporation, Bighorn Lumber Co., a Wyoming corporation, and Louisiana Pacific Corporation, a Delaware corporation, Intervenor Defendants.

No. 01–CV–0078–B.

United States District Court,
D. Wyoming.

Oct. 1, 2002.

Edward B Zukoski, Land and Water Fund of the Rockies Inc, Boulder, CO, Steve Jones, Jackson, WY, for Plaintiff.

Carol A Statkus, Asst U.S. Atty, U.S. Attorney's Office, Cheyenne, WY, Donna S Fitzgerald, Wells D Burgess, Department of Justice, Environment & Natural Resources Division, Washington, DC, Scott W Horngren, Haglund, Kirtley, Kelly & Horngren, Portland, OR, Harriet M Hageman, Hageman & Brighton, Cheyenne, WY, for Defendants.

## MEMORANDUM OF ORDER AND JUDGMENT

BRIMMER, District Judge.

Plaintiffs Biodiversity Associates, Friends of the Bow and Leila Bruno bring this suit against the Forest Service, the Regional Forester, and the Forest Supervisor challenging various timber sales on the Medicine Bow National Forest. Intermountain Forest Association, Bighorn Lumber Company, and Louisiana Pacific Corporation were allowed to intervene as defendants on September 14, 2001.

Plaintiffs' suit arises from their claims that Defendants have violated the National Forest Management Act, 16 U.S.C. § 1601 et seq., by failing to revise the Medicine Bow National Forest Plan and by utilizing a timber sale schedule not contemplated by the Plan; that Defendants have violated the National Environmental Policy Act,

42 U.S.C. § 4321 et seq., by failing to supplement the programmatic Environmental Impact Statement to account for new information and changed circumstances; that Defendants have violated Section 327 of the Department of the Interior and Related Agencies Appropriations Act for Fiscal Year 2002 by failing to act expeditiously and in good faith, within the funding available, to revise the Medicine Bow National Forest Plan; and that pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Court may set aside Defendants' actions which have been arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

Defendants and Intervenor Defendants contend that Section 327 forecloses challenges based on the staleness of the Medicine Bow National Forest Plan documents during fiscal year 2002; that the Environmental Assessments for the challenged timber sale projects adequately address new information and changed circumstances pending the revision of the Medicine Bow National Forest Plan; that the United States Forest Service is meeting the Section 327 standards in its efforts to revise the Medicine Bow National Forest Plan; and that Plaintiffs have failed to demonstrate entitlement to injunctive relief against the Jack Creek # 3 sale, on a balance of the equities.

On July 17, 18, 19, 24 and 25, 2002, this Court conducted a hearing initially on Plaintiff's Motion for Preliminary Injunction. At the close of proceedings on July 19, 2002, the parties stipulated and the Court so ordered that the matter before the Court should be merged with a trial on the merits. Fed.R.Civ.P. 65(a)(2). Therefore, the Court now issues its findings of fact and conclusions of law and enters judgment. Fed.R.Civ.P. 52(a), 58. After hearing the issues presented at the hearing, considering the evidence, and being fully advised of the premises, the Court **FINDS** and **ORDERS** as follows:

### *Statement of Parties and Jurisdiction*

Plaintiff Biodiversity Associates is an incorporated non-profit organization based in Laramie, Wyoming, founded to garner increased protection for wildlands and native wildlife and their habitats in the Medicine Bow National Forest ("MBNF") and the Rocky Mountain Region. Plaintiff Friends of the Bow is an unincorporated, non-profit organization based in Laramie, Wyoming, dedicated to the protection and restoration of the MBNF. Plaintiff Leila Bruno is a citizen of Wyoming and co-founder of Biodiversity Associates and a member of Friends of the Bow, who engages in numerous outdoor activities in the MBNF.

Defendant United States Forest Service ("USFS") is a federal agency within the United States Department of Agriculture. The Secretary of Agriculture has delegated to the USFS the responsibilities of protecting resources and properly managing uses and activities on National Forest System lands, including lands in the MBNF. The national headquarters of the USFS is located in Washington, DC. The headquarters for the Rocky Mountain Region of the USFS is located in Golden, Colorado. The USFS headquarters for the MBNF is located in Laramie, Wyoming.

Defendant United States Forest Service Rocky Mountain Regional Forester is a USFS official who is charged with overseeing USFS activities in the Rocky Mountain Region of the National Forest System, including the MBNF. The Regional Forester is responsible for supervising the revision of the MBNF's 1985 Forest Plan (the "Plan") and programmatic Environmental Impact Statement ("EIS"), as well as for issuing a timely revision of the Plan

and EIS, among other duties. The current Regional Forester is Rick Cables and his office is located in Golden, Colorado.

Defendant United States Forest Service Medicine Bow National Forest Supervisor is an official of the USFS. The Forest Supervisor's responsibilities include supervising activities on the MBNF to ensure the protection of National Forest resources and comply with all applicable laws, regulations and Forest Service policies, among other duties. The current MBNF Forest Supervisor is Mary Peterson and her office is located in Laramie, Wyoming.

Intervenor Defendant Intermountain Forest Association ("IFA") is an Idaho non-profit corporation whose members are sawmills, loggers and related independent businesses that rely on national forest timber sales in the intermountain west for their livelihood. Intervenor Defendant Bighorn Lumber Company ("Bighorn") is a Wyoming corporation that operates a sawmill in Laramie, Wyoming. Historically, more than half of Bighorn's federal timber supply has come from the MBNF. Bighorn also owns forest land adjacent to the MBNF that it claims is threatened by infestation of insects and disease and the spread of fire if these dangers are not controlled on the MBNF. Intervenor Defendant Louisiana Pacific Corporation is a Delaware corporation that operates a sawmill in Saratoga, Wyoming. The USFS awarded Louisiana Pacific the Joe's Park timber sale, which was initially implicated in this suit. Both Bighorn and Louisiana Pacific are members of IFA.

The Court has jurisdiction over this controversy pursuant to the Administrative Procedure Act, 5 U.S.C. § 702 (right of review); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201 (declaratory relief); 28 U.S.C. § 2202 (injunctive relief); and 28 U.S.C. § 1361 (mandamus). Venue is proper pursuant to 28 U.S.C. § 1391(e).

## Statutory Background

### 1. The National Forest Management Act

■ Pursuant to congressional mandate, national forests are administered under the National Forestry Management Act ("NFMA"), 16 U.S.C. § 1601 et seq. "NFMA requires the Secretary of Agriculture to develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." *Ohio Forestry Association, Inc. v. Sierra Club*, 523 U.S. 726, 728, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

■ NFMA controls national forest management at two levels. First, it requires the implementation of a forest plan, a broad, comprehensive document addressing forest policy and stewardship concerns. *See* 16 U.S.C. § 1604(d); 36 C.F.R. § 219.10(b). Forest plans are intended to "guide all natural resource management activities, including use of the land for outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness. In developing the plans, the Service must take both environmental and commercial goals into account." *Ohio Forestry*, 523 U.S. at 729, 118 S.Ct. 1665 (citations omitted). Second, after a forest plan is created, it is implemented through the consideration and adoption of individual forest projects. *See* 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e). These projects must be consistent with the forest plan. *Id.*

At issue in this case is NFMA's mandate that a forest plan "shall be revised ... from time to time when the Secretary finds conditions in a unit have significantly changed, but at least every fifteen years." 16 U.S.C. § 1604(f)(5). It is undisputed that the current MBNF Plan is more than fifteen years old. The statute is silent on the consequences of a failure to revise a plan within the fifteen year period.

## 2. The National Environmental Policy Act

██ Both the forest plan and the implementing projects are subject to the requirements of the National Environmental Policy Act ("NEPA"). 42 U.S.C. §§ 4321 et seq. Under NEPA, federal agencies such as the USFS are required to analyze any "major federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332. NEPA does not mandate a particular outcome in agency decisionmaking; it merely requires agencies to observe procedures designed to ensure citizens and officials are informed and allowed to comment on agency action before decisions are made. *See Environmental Defense Fund, Inc. v. Andrus,* 619 F.2d 1368, 1374–78 (10th Cir.1980). "Congress intended these 'action-forcing procedures' [in NEPA] merely to guarantee that agencies take a 'hard look' at the environmental consequences of proposed actions utilizing public comment and the best available scientific information." *Colorado Environmental Coalition v. Dombeck,* 185 F.3d 1162, 1171 (10th Cir.1999).

The primary tool for environmental analysis under NEPA is an environmental impact statement ("EIS"). An EIS is a detailed statement on:

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

NEPA does not specifically address how to decide whether an EIS is required, but under regulations implemented by the Council for Environmental Quality ("CEQ"), agencies may conduct an environmental assessment ("EA") to determine if a proposed action has potentially significant environmental impacts. 40 C.F.R. §§ 1501.4, 1508.9(a). If not, a Finding of No Significant Impact ("FONSI") is issued, no EIS is necessary, and action may proceed. *Id.*

██ To avoid redundancy and facilitate the completion of project-level EAs and EISs, agencies are allowed to piggy-back a portion of their analysis on the applicable findings of a programmatic EIS in a process called "tiering." 40 C.F.R. § 1508.28. The CEQ regulations define tiering as:

> [T]he coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

*Id.* Agencies may tier information from a programmatic EIS to a project EIS or EA, or from an earlier EIS to a subsequent supplemental EIS or EA. *Id.* NEPA documents can only be tiered to another EIS, not to a Forest Plan. *Muckleshoot Indian Tribe v. United States Forest Service,* 177 F.3d 800, 810 (9th Cir.1999).

██ To ensure NEPA procedures are based on the "freshest" information, an agency is required to supplement NEPA documents when there are significant new

circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts. 40 C.F.R. § 1502.9(c)(i) and (ii). A supplemental EIS ("SEIS") is not necessarily required in every instance of altered federal action, new information or changed circumstances. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

 However, "if there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Id.* at 374, 109 S.Ct. 1851. Agency decisions regarding the necessity ·of both initial and supplemental EISs are reviewed under the arbitrary and capricious standard. *Village of Los Ranchos De Albuquerque v. Marsh,* 956 F.2d 970, 973 (10th Cir.1992). A decision is arbitrary and capricious if:

> the agency ... relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Lamb v. Thompson,* 265 F.3d 1038, 1046 (10th Cir.2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Courts may use injunctive relief to cure an agency's deficiencies in observing NEPA procedures. *Ross v. Fed. Highway Admin.,* 162 F.3d 1046, 1054 (10th Cir.1998).

**3. The Administrative Procedure Act**

The Administrative Procedure Act ("APA") imposes duties on courts reviewing agency actions in two important ways.

First, courts are required to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Second, courts must "hold unlawful and set aside agency action" where such agency action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

 Where appropriate, relief in the form of a mandatory injunction may issue under the APA. *See Mt. Emmons Min. Co. v. Babbitt,* 117 F.3d 1167, 1170 (10th Cir. 1997). Such extraordinary relief may issue only to cure "final agency action for which there is no other adequate remedy in court." 5 U.S.C. § 704. Agency action is defined as including "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or a failure to act." 5 U.S.C. § 551(13).

### *Findings of Fact*

**I. *The Medicine Bow National Forest***

1. The MBNF is located in Wyoming and contains approximately 1,100,000 acres of forest lands in Albany, Carbon, Converse, Natrona and Platte counties in separate areas including the Hayden Area, the Medicine Bow Mountains area, the Pole Mountain area, and the Laramie Peak area. Administrative Record (hereinafter "AR"), Vol. 1 at 6, 46.

2. The MBNF is largely composed of continuous forest cover in various stages of growth. Transcript of Hearing Proceedings in Biodiversity Assoc., et al. v. U.S. Forest Service, et al., No. 01–CV–078–B (D.Wyo.) (hereinafter "Tr.") at 409, lines 13–20; Exh. I–35.

3. Roadless and wilderness areas combined comprise about 37% of the forest. Tr. at 446, line 14—25.

4. 55.3% of the wilderness on the MBNF is mature forest, and 54.2% of the roadless areas on the MBNF are in ma-

ture condition. Tr. at 627, lines 15–18; Tr. at 628, lines 14–16.

5. The Supervisor's office, located in Laramie, Wyoming, provides oversight to the combined administrative unit of the Medicine Bow and Routt National Forests and Thunder Basin National Grassland in Wyoming and Colorado. Tr. at 366 lines 5–17.

## II. *The 1985 Medicine Bow National Forest Plan*

6. On November 20, 1985, Defendant USFS issued a Land and Resource Management Plan (the "Plan") for the MBNF. AR at 4.

7. The purpose of the Plan was "to develop an overall strategy to guide management of the [MBNF] for the period 1986–1995 with projections to the year 2030." AR at 1.

8. The alternative which was chosen as the basis for the Plan decreased emphasis on timber harvesting and livestock grazing and increased emphasis on other resource values, including wildlife. AR at 4–29.

9. The Plan described the management situation on the MBNF; the management direction proposed; and the general management requirements, divided by resource, to attain the direction proposed. The Plan also allocated the MBNF into management areas of differing resource emphasis with specific management requirements (prescriptions) to guide activities in each of those areas. AR at 31—492.

10. A final Environmental Impact Statement ("EIS") was issued in tandem with the Plan in November of 1985 pursuant to the requirements of NEPA. *See* AR at 493–2030. The final EIS analyzed, among other things: 1) the impact of various alternative management strategies for the MBNF, including the one approved by the USFS in November 1985 (AR at 603–606); 2) the impact of managing the MBNF given an assumed maximum timber harvest level (the "allowable sale quantity" or "ASQ") (AR at 523); and 3) the environmental impact of management, given the adoption of certain standards and guidelines (AR at 790–965).

11. Total acres analyzed in the EIS were 1,665,860. AR at 497.

12. Long term estimates of the physical, biological, economic and social impacts were considered in the decision to adopt the Plan. AR at 101–114. These estimates were disclosed in the EIS. AR at 493—2030.

13. USFS has been implementing the Plan through various types of site-specific projects and activities, including timber sales, since its adoption in 1985 and continues to do so to this day. It has continually monitored the effects of implementation of the Plan on the various resources of the MBNF and reported the results in annual monitoring reports. AR at 2411—3645.

14. The monitoring reports led to numerous amendments to the Plan, dealing with various issues arising during its implementation. AR at 2031—2410. These amendments, where necessary, were accompanied by environmental analyses pursuant to NEPA. *See, e.g.*, AR at 2229, 2250, 2272, 2294, 2316, 2379, 2394.

15. The Plan contained a ten year timber sale schedule prefaced by the explanation that it was based on current conditions and information, that it might be modified during implementation as conditions change or new information became available, and that the degree of the modification would determine whether or not the Plan needed amendment. AR at 422—433. The Plan was amended several times during implementation to change the timber sale schedule. *See e.g.*, AR at 2055, 2061, 2228, 2247.

16. As of the date of this Order, the USFS has not completed a revision of the 1985 MBNF Plan, nor has the USFS completed a supplement to the forest-wide, programmatic EIS that accompanied the 1985 MBNF Plan.

### III. *The Joes Park, Jack Creek # 3, and Bird Creek Timber Sales*

17. The three timber sales challenged in this case are the Joes Park Timber Sale, the Jack Creek # 3 (JC3) Timber Sale, and the Bird Creek Timber Sale. AR at 4727–4874.

18. The Bird Creek sale was advertised, but resulted in a rejection of all bids on May 3, 2001 and has not been readvertised or awarded. The Joes Park Timber Sale is nearing completion and no injunctive relief is sought as to it.

19. A final Environmental Assessment ("EA") for the Jack Creek Timber Sale was published in January 1999. (AR at 4883—5034). In July 1999, instructions were given to redo the economic analysis on the Jack Creek decision. The economic analysis was redone and was included as part of the January 13, 2000 Decision Notice and Finding of No Significant Impact ("FONSI") for the Jack Creek Timber Sale. (AR at 5035—5050). The MBNF Supervisor approved and authorized the Jack Creek project through this Decision Notice and FONSI. *Id.* The EA indicated that the preferred alternative was not a major Federal action that would significantly affect the quality of the human environment, individually or cumulatively, and so the USFS did not need to prepare an EIS as the decision would not have a significant effect on the human environment. AR at 5049. The Jack Creek EA analyzed the impacts of both the JC3 and Joes Park timber sales.

20. The JC3 Sale Decision Notice authorized the sale and logging of approximately 8.5 million board feet of sawtimber over 1,367 acres of public land on the MBNF in the Jack Creek area, including approximately 436 acres of clearcutting. AR at 5036. To conduct this logging, approximately seven miles of road construction or reconstruction work is necessary. AR at 5037.

21. The JC3 Timber Sale includes the construction or reconstruction of 3.5 miles of road, and the removal of 5.6 million board feet of timber through the logging of 540 acres (including 291 acres of clearcuts). The JC3 Timber Sale contract was awarded to Bighorn Lumber Company. AR at 5771–5784; Tr. at 439.

22. The Joes Park portion of the Jack Creek project includes the removal of 4.01 million board feet of timber through the logging of 514 acres (including 124 acres of clearcuts). The Joes Park Timber Sale contract was awarded to Louisiana Pacific. AR at 5720–5730; Tr. at 438–439.

23. The Jack Creek EA tiered its analysis to the 1985 forest-wide EIS, pursuant to NEPA. AR at 5049. As a result of this tiering, the Jack Creek EA's economic analysis (AR at 5044); definition of key terms concerning wildlife diversity (AR at 4927); standards and guidelines shaping timber sale design (AR at 4929)(concerning old growth standards); and the "Purpose and Need" statement arise directly out of the 1985 MBNF Plan. (AR at 5039). The JC3 Timber Sale was to be implemented to achieve the desired conditions described in the 1985 MBNF Plan. AR at 5035, 5039.

24. The USFS prepared an EA for the White Swan/Holmes Timber sale and Watershed Improvement Projects dated March 1996. AR at 4548. The USFS issued a FONSI and Decision Notice for the White Swan/Holmes Timber Sale and Watershed Improvement Projects on March 29, 1996. AR at 4534. The White Swan/Holmes EA and Decision Notice pro-

posed and analyzed units which make up the Bird Creek sale at issue here. A final EA on the Fall Creek/Bird Creek Timber Sale was published in July of 1997. (AR at 4727). A Decision Notice and FONSI on this sale was issued on April 8, 1998. AR at 4875–4887. The EA indicated that the preferred alternative was not a major Federal action that would significantly affect the quality of the human environment, individually or cumulatively, and so the USFS did not need to prepare an EIS as the decision would not have a significant effect on the human environment. AR at 4885.

25. The Fall Creek/Bird Creek Timber Sale Decision Notice authorized logging of approximately 4.072 million board feet of timber across 1,451 acres of public land on the MBNF, as well as the construction of 3.6 miles of new roads and the reconstruction of 15.8 miles of roads to facilitate this timber sale. AR at 4875–4887.

26. The Fall Creek/Bird Creek Timber Sales EA tiered its analysis to the 1985 forest-wide EIS, pursuant to NEPA. AR at 4728. As a result of this tiering, the Fall Creek/Bird Creek Timber Sales EA's general impacts (AR at 4785); economic and social analysis (AR at 4814); and standards and guidelines shaping timber sale design (AR at 4929)(concerning hiding cover standards for big game)(AR at 4802) (concerning old growth and wildlife habitat standards) arise directly out of the 1985 MBNF Plan.

27. In an administrative appeal of the Jack Creek Timber Sale decision in 2000, it was alleged that the timber sale would contribute to an unsustainable harvest level on the MBNF. AR at 5437–5450. USFS replied:

> Sustainability is determined at the Forest Planning level ... Until the Forest Plan is amended or revised, utilizing full public participation and disclosure, there

is no scientific or legal basis for any other "sustainable harvest" figure. AR at 5515–5516.

USFS replied similarly to a 1999 appeal of the Jack Creek sale ("Reassessment of the suitable timber base is a Forest Plan issue, and is beyond the scope of this analysis")(AR at 5386), and to a 1998 appeal of the Fall Creek/Bird Creek Timber Sale. AR at 5230.

28. The Jack Creek EA and the Fall Creek/Bird Creek EA discuss forest fragmentation, although neither EA analyzes the effects of fragmentation forest-wide. The absence of such information in those EAs was discussed at the preliminary injunction hearing. *See* testimony of Dr. William Baker, Tr. at 222–223, 230–231, 236–237, 249–250; testimony of Erik Molvar, Tr. at 313; testimony of Mary Peterson, Tr. at 518. Scientific concern over forest fragmentation only developed after the 1985 MBNF Plan EIS was completed, and consequently, that EIS does not consider the effects of forest fragmentation. *See generally* testimony of Dr. Baker, Tr. 196–216.

29. The Jack Creek EA and the Fall Creek/Bird Creek EA consider the impacts of these timber sales on sensitive species and reach conclusions about the impact of the proposed actions on forest-wide populations of sensitive species. AR at 5688, 5614. Forest-wide population data is an issue to be dealt with at the MBNF Plan level, not by a site specific EA. Tr. at 518–519. *See* testimony of Jeff Kessler, Tr. at 83–84 (MBNF concludes adverse impacts to individuals but not to population as a whole, though MBNF has no data on population as a whole). No forest-wide analysis of the effect of these timber sales is found in the 1985 MBNF Plan EIS to which the EA tiers.

30. Jack Creek EA and the Fall Creek/ Bird Creek EA consider the impact of

these timber sales on threatened or candidate species, but do not supply data on forest-wide threatened or candidate species protected by the Endangered Species Act (ESA). EAs conclude that there will be no impact from the proposed actions on populations of threatened or candidate species forest-wide. AR at 5688; AR at 5614. No forest-wide analysis of the effect of these timber sales is found in the 1985 MBNF Plan EIS to which the EA tiers.

## IV. *Occurances Since the Adoption of the 1985 Forest Plan*

31. The administrative record and the evidence presented at the hearing demonstrate that since the completion of the MBNF Plan and Plan EIS, several things have occurred:

a. *Special Review Team.* In March 1990, the MBNF Regional Forester convened a Special Review Team ("SRT") of recognized experts to review the implementation of the 1985 MBNF Plan and generally to offer advice on the administration of the MBNF. After visiting the MBNF and meeting with a wide variety of interested parties, including timber industry officials and plaintiffs, the SRT issued a report. AR at 3900–3956.

In its May 1990 Report, the Summary of Conclusions stated:

We find that there are several significant problem areas in the administration of the MBNF. Most of these problem areas derive from an emphasis on the production of commercial wood products. The priority on timber production has driven, and drives, much of the Forest plan and the implementation of the plan.

We emphasize that this is not a situation unique to the MBNF. In our experience, an emphasis on timber production drives the basic decision-making processes in most National Forests in the western US. In that sense, while we

view the problems here to be substantial, the administration of the MBNF is similar to that which prevails in most western National Forests.

This report will identify a number of problem areas. Importantly, the Forest Supervisor and his staff are already developing programs in response to several of these concerns. These actions are highly constructive and are evidence of changing policies in this National Forest. This changing set of attitudes in the MBNF was mentioned favorably by several witnesses.

We do not, in this report, make recommendations as to whether the existing Plan must be amended or revised. Many of these problem areas can be addressed by other means, including fuller implementation of the existing Plan and the development of administrative policies not rising to the level of Plan amendments. Further, in the interest of administrative flexibility, we think it appropriate that procedural methods of addressing the problem areas we raise should be left to the discretion of the Forest Supervisor.

AR at 3904.

b. *Timber Supply and Demand Study.* On October 22, 1991, in the wake of the Special Review Team Report, the MBNF Forest Supervisor issued a document entitled "A Direction for the '90s." In that 1991 document, the Forest Supervisor acknowledged there was a "need to look more carefully at the amount of timber harvest, to determine if the amount is sustainable and if it meets the Standards and Guidelines in the Forest Plan." AR at 3892. The Forest Supervisor spoke of a "timber supply and demand study" ("TSDS") which would calculate timber sales between 1991 and 2015 based on Forest Plan Standards and Guidelines. AR at 3889.

The Forest Supervisor stated that "[i]f this timber supply study indicates timber harvest levels should be changed, we will consider amending the Forest Plan, evaluating a full range of alternatives using the National Environmental Policy Act process, and involving the public in all phases." AR at 3889. The purpose of the study was to "help determine if there has been a change in conditions or if new information is now available that would lead to a change in the Forest Plan." AR at 4037.

The TSDS was initiated in or around 1989. The TSDS evaluated available sawtimber supply by selecting "[c]utting units entirely consistent with the [1985] Forest Plan" and "designed and selected to harvest the maximum amount of timber...." AR at 3894.

The MBNF halted the TSDS in or around January 1992. Forest Plan Revision Meeting and Forest Supervisor's Address (Jan. 8, 1993), at 5, Plaintiffs' Trial Exhibit 19. Before being halted, the Study had been completed on about 60% of watersheds on the MBNF. *Id.*

While incomplete, the TSDS indicated that the allowable sale quantity ("ASQ")(which is an estimate or projection of timber that can be harvested annually or over some period of time for the forest, but which is not a figure that the USFS is required to meet (Tr. at 502, 505)) calculated in the 1985 Forest Plan, which informed the standards and guidelines for management of the Forest, was too high. *Id.* The TSDS indicated that the ASQ should have been 7 to 11 million board feet, not 28 million. *Id.* at 6. Testimony offered at trial supports this conclusion. Testimony of Mary H. Peterson, Tr. at 405–407; AR at 12.

The MBNF halted work on the TSDS because the complexities involved with the study and the amount of time and money that it would take to complete the TSDS would be better directed to the Plan revision. Plaintiffs' Ex. 19 at p. 5.

Even though the ASQ in the 1985 MBNF Plan was found to be high, the TSDS was halted, and the Plan has not yet been revised as of this Order, the evidence shows that the actual amount of timber sold on the MBNF since 1994 has been significantly below the ASQ in the 1985 Plan and also below the 7—11 million board feet ASQ projected by the incomplete TSDS. Tr. at 407, Government Ex. H. Between 1994 and 2001, the actual volume of timber sold has averaged 4.8 million board feet per year. *Id.*

c. *Forest Fragmentation.* Since the adoption of the MBNF Plan in 1985, virtually the entire science of landscape ecology and the concept of fragmentation has arisen. *See* Baker, Landscape Structure Measurements for Watersheds in the Medicine Bow National Forest Using GIS Analysis (Dec. 29, 1994), AR at 6072–6268; Reed et al., Fragmentation of Forested Rocky Mountain Landscape (1994), AR at 6062–6070; Tr. 196–216. Dr. Baker's "Landscape" report concludes that there is a current and serious deficit in mature and old growth interior forest that was caused by, and is not likely to be remedied by, clear-cutting. *See, e.g.,* Baker, Landscape Structure Measurements for Watersheds in the MBNF, AR at 6076; *see also* Testimony of Dr. Baker, Tr. at 233 (describing his 1994 report).

The existence, and impacts, of fragmentation at a forest-wide level are not addressed in the 1985 Plan, or the accompanying EIS. The Administrative Record contains no evidence that the USFS has attempted to analyze forest fragmentation at a forest-wide level.

Dr. Baker, a landscape ecology expert who has studied fragmentation on the MBNF, testified that the 1985 Plan and forest-wide programmatic EIS were "an-

tiquated" and "badly out of date" in their approach to fragmentation. Tr. at 215, 249. Dr. Baker testified regarding new information that has arisen since the 1985 MBNF, including the extent to which: (a) the MBNF is fragmented from logging as well as roads (Tr. at 210–212); (b) protecting small patches of old-growth (as considered in the 1985 MBNF Plan) is useful in preserving species that rely on interior forest (Tr. at 221–222); (c) aggregating harvests might be a way to reduce the impacts of fragmentation (Tr. at 245–246); and (d) high-contrast edge may be detrimental to biodiversity across the forest. Tr. at 249.

Dr. Baker testified that if a forest plan contained information on landscape scale issues, then project level analyses could incorporate that information; otherwise, landscape ecology and fragmentation concerns cannot be addressed by looking at a site-specific, project level analysis. Tr. at 219–221.

However, the EAs for the Timber Sales at issue in this case considered Dr. Baker's works, and thus considered forest wide concerns in implementation of these site specific projects. *See Infra.*

d. *Sensitive Species.* The USFS's Rocky Mountain Region—the administrative Region of which the MBNF is a part—first promulgated a sensitive species policy and issued a sensitive species list in 1993, and revised them in 1994. AR at 3863–3878. This list contains about 79 plants and 87 animals that occur in the region. Of these, 5 plants and 34 animals occur on the MBNF.

The Administrative Record contains no evidence that the MBNF has undertaken surveys or headcounts of sensitive species on a systematic, forest-wide basis since the adoption of the sensitive species list. See Testimony of Mary Peterson, Tr. at 500, 502 (admitting MBNF has no headcounts of sensitive species across the Forest as a whole); Tr. at 501 (population data for sensitive species is the kind of data collected during a Plan revision); testimony of Jeff Kessler, Tr. at 83–84 (while MBNF concludes adverse impacts to individuals, but not to population as a whole, MBNF has no data on population as a whole); testimony of Erik M. Molvar, Tr. at 325–326 (with few exceptions, MBNF possessed no population data on any of the sensitive species or management indicator species except for those which were game species that were tracked by the Wyoming Game & Fish Department).

e. *Threatened, endangered, and candidate species.* Since the adoption of the 1985 MBNF Plan and the accompanying programmatic EIS, the U.S. Fish and Wildlife Service has designated as threatened or as candidate species several species for which habitat occurs on the MBNF. These include the lynx (threatened), 65 Fed.Reg. 16052 (Mar. 24, 2000), Prebles meadow jumping mouse (threatened), 63 Fed.Reg. 26517 (May 13, 1998), and the boreal toad (candidate), 60 Fed. Reg. 15281 (March 23, 1995). *See also* AR at 3571.

## V. *Pre–1999 Efforts to Revise the Plan*

32. The USFS requested that the 1985 MBNF Plan be scheduled for revision beginning in Fiscal year 1993. AR at 4490.

33. In early 1995, the MBNF, Thunder Basin National Grassland and Routt National Forest were administratively combined. Tr. at 367.

34. At that time, both the Routt and MBNF plans were undergoing revision. Tr. at 125. Since the Routt plan was older (approved in 1983) and closer to completion, and there were limited financial and human resources to complete both revisions, the MBNF Plan revision was deferred until the Routt plan could be completed. Tr. at 3678–68, AR at 3319–3320.

35. The 1997 Routt Revised Land and Resource Management Plan as analyzed in the Final Environmental Impact Statement was approved in early 1998. Tr. at 373.

36. The Notice of Intent ("NOI") to revise the land and resource management plans for all ten units of the Northern Great Plains planning effort, including the Thunder Basin, was published in 1997. AR at 4526–4530.

37. A Record of Decision for the Thunder Basin Land and Resource Management Plan—2001 Revision was approved in July 2002. Tr. at 373.

38. In fiscal year 1998, Congress curtailed funding for National Forests and National Grasslands plan revision processes that had not already issued a NOI to revise. AR at 3882.

39. The MBNF had not yet published an NOI to revise. Tr. at 372.

## VI. *Post–1999 Efforts to Revise the Plan*

40. In Fiscal Year 1999, Congress authorized funding for new forest plan revisions or new grassland plan revisions, and an updated Purpose and Need Planning Criteria was completed in 1999. AR at 5894—5914.

41. A NOI to revise the MBNF Land and Resource Management Plan was published in the Federal Register in 1999. Tr. at 376.

42. The fifteen year anniversary date of the MBNF Plan was November 20, 2000. 16 U.S.C. § 1604(f)(5).

43. The Forest Service is currently revising the MBNF Plan. AR at 5960.

44. The USFS expects to publish a draft environmental impact statement by the end of calendar year 2002, and expects to be finished with the MBNF Plan revision by late 2003. Tr. at 386; Jan. 10, 2002 Decl. of Lynn Jackson at ¶ 2.

45. Prior to November 2000, a number of milestones in the Plan revision process were completed: 1) soil surveys; 2) reasonable and foreseeable oil and gas development reports; 3) wild and scenic river eligibility identification; 4) special interest area identification; 5) draft economic assessments; 6) mineral resource survey by the Wyoming Geological survey; 7) watershed assessment of equivalent clearcut acres; 8) timber yield tables; 9) geographic area existing condition reports; 10) completion of draft historic range of variability report; 11) completion of market demand analysis; 12) completion of timber suitability coverage; 13) recreation summer ROS; 14) range capability assessment; 15) roadless area inventory; 16) scenery management system GIS layers; 17) publication of a NOI to revise the Plan and public open houses; 18) updated purpose and need; and 19) completed a Memorandum of Understanding with Wyoming conservation districts. Tr. at 375–377; Govt. Ex. A.

46. The following are some major activities that were initiated and accomplished after November, 2000: 1) Analysis of the Management Situation (Spring 2001); 2) public presentation of baseline assessment reports (April 2001); 3) three field trips to sites on the MBNF were held with the public to discuss major revision issues (September 7, 2001); 4) eight public meetings were held in communities in and around the MBNF to validate issues, the need to change the MBNF Plan, and to discuss six draft alternatives (November—December 2001). The public was so interested in meeting with the USFS that they asked for four more meetings than the four originally scheduled and asked for a time extension to facilitate public comments on the draft alternatives. Declaration of Lynn Jackson at 7–8; Govt. Ex. B.

47. The USFS has been very responsive to its cooperators and the public in the

revision process, and has undertaken such actions as scheduling public meetings in response to requests, incorporating and utilizing public comment, and operating a public website. Tr. at 565.

48. The USFS also obtained a large degree of public input in developing the alternatives for the plan EIS. Tr. at 387.

49. Since September of 2001, a number of tasks related to plan revision have been accomplished, including the initiation of two new assessment reports, holding fourteen public meetings, and obtaining regional forester review and approval of the range of alternatives. Tr. at 379–380; Govt. Ex. C.

50. The USFS has re-allocated resources and trimmed expenses to obtain sufficient funds for the forest planning effort in fiscal year 2002. Tr. at 381–382; Govt. Ex. D.

51. The funding for the MBNF Plan revision has almost doubled from the years 1999 and 2000 to 2001 and 2002. Tr. at 384; Pl.Ex. 22.

52. Since January of 2001, five permanent staff members have been added to the planning interdisciplinary team. Tr. at 384.

53. The USFS has developed a schedule with proposed deadlines to meet a fall, 2003 deadline for issuance of the final revised plan, record of decision, and EIS. Tr. at 388–389; Govt. Ex. E.

54. The MBNF Plan revision process is a complex process which typically takes four to five years to complete. Tr. at 389–390.

55. Revision of the Plan has been delayed numerous times since it was first announced that it would be completed in 1995. *See* Forest Plan Revision Work Plan (Dec. 29, 1992) at 8, Pls' Ex. 43D, 43E, 43G–Q; Forest Plan Revision Meeting and Forest Supervisor's Address (Jan. 8, 1993), at 2–3, Pls' Ex. 19; AR at 3146,

3249, 5490 (all showing various difficulties with the revision, as well as the gradual progression of a later and later deadline for the completion of the revision). The inability to complete the MBNF Plan revision before November of 2000 stemmed in part from a lack of funding and the complication of consolidating two forests and creating a separate plan for the Thunder Basin Grassland. Tr. at 399–400.

56. The USFS is on schedule to issue a final revised plan by fall 2003. Tr. at 398.

## VII. *Congressional Action*

57. As of April, 2002, only 12 National Forests out of 127 had completed their Plan revisions. Report to the House & Senate Committees on Appropriations on Forest Service Land and Resource Planning, The Status of Activities, USDA Forest Service 31 January 2002 at 7, attached as Ex. 2 to Defendants' Notice to the Court dated April 18, 2002.

58. As of October 1, 2001, 39 of the Forest units were in some stage of the revision process, and as of April, 2002, approximately 110 plans would not be completed by the statutory 15 year deadline. Report to the House & Senate Committees on Appropriations on Forest Service Land and Resource Planning, The Status of Activities, USDA Forest Service 31 January 2002 at 3, 7–12, annexed to Defendants' Notice to the Court dated April 18, 2002.

59. Congress responded to the delay in completing forest plans by enacting Section 327 of the Department of the Interior and Related Agencies Appropriations Act, 2002, Pub.L. No. 107–63, 115 Stat. 414 (Nov. 5, 2001) (hereinafter, "Section 327").

## VIII. *Fragmentation and the Jack Creek Timber Sale*

60. The purpose and need of the JC3 timber sale was to improve vegetative diversity, improve forest health, provide tim-

ber to meet public demand, integrated pest management, watershed restoration, and big game security. Tr. at 421–422.

61. The USFS considered three alternatives before deciding how to proceed with the JC3 timber sale, and chose the alternative that best met the purposes and needs. Tr. at 422–423.

62. The Jack Creek EA noted that several commenters had raised a concern about the effects of the proposed sale on fragmentation, and that the issue had been used to develop alternatives. AR at 4900–01.

63. The fragmentation issue was framed in terms of a shortage of undeveloped areas on the forest, an abundance of heavily roaded and cut areas, and concern for the decline in aspen in the vicinity. AR at 4901.

64. The Jack Creek EA analyzed the forest fragmentation expected to result from the proposed action, noting that the USFS planned to concentrate harvest units in seven areas that had past timber sale entries. AR at 4902; Tr. at 423.

65. Moreover, clearcutting and overstory removal harvest methods would be used to maintain and promote aspen in the vicinity. AR at 4902; Tr. at 422–423.

66. The Jack Creek EA also analyzed the amount of road construction, re-construction, and temporary construction that would be needed. Id.

67. The Jack Creek EA noted certain planned mitigation measures, such as closing the road after the sale to restrict vehicle use. Id.

68 To reduce fragmentation, the MBNF staff is working towards reducing the amount of roads in the forest. Tr. at 420.

69. The JC3 sale will rely mostly on road re-construction, instead of new road construction, and all of the new road con-struction will be closed after the harvest. Tr. at 488, 605, 607.

70. The Jack Creek EA also noted that under the proposed action, commercial thinning will be done to maintain potential Northern goshawk habitat, as well as improve forest resiliency to insects and disease, and increase tree growth. AR at 4902; Tr. at 423.

71. The Jack Creek EA noted that harvesting would be used over a series of entries to consolidate areas fragmented by past clear-cutting, and would also reduce the spread of dwarf mistletoe. AR at 5047.

72. In the Jack Creek area, the lodgepole pine stands are very heavily infected with mistletoe, and they are at the age where regeneration, through a system of clearcut harvesting, is the appropriate course of action to take in order to end up with a more contiguous young stand of healthy trees, that will grow all together into a stand of mature trees. Tr. at 488–489.

73. The proposed timber harvest will also maintain blocks of mature trees and create blocks of young trees, so as to create a "mosaic" to provide habitat needs for various forms of wildlife and plant species, including goshawks. Id.

74. The JC3 sale was intended to help reduce the fragmentation that already existed in the area through past harvest activities and road building. Tr. at 424.

75. The Jack Creek EA explained that "[i]n keeping with the concepts of Forest Plan implementation and ecosystem management, the Forest Service completed an ecosystem analysis within the Jack Creek sixth-level watershed." AR at 4892.

76. The Jack Creek EA goes on to note that during the 1995—1997 field seasons, the USFS conducted extensive field sur-

veys of existing conditions in certain areas. *Id.*

77. The Jack Creek EA compared historical conditions to existing and desired conditions, and identified projects, including the planned timber sales analyzed in the Jack Creek EA, that would move the area toward its desired condition. *Id.*

78. The comments of Biodiversity Associates and the concerns of the public regarding fragmentation and road-building were addressed by the USFS. Tr. at 423–424; AR at 5011.

79. The USFS is not allowing timber sales in roadless areas or wilderness areas, which comprise about 37 percent of the MBNF, pending completion of the revised Plan. Tr. at 446–447, 530.

80. The Jack Creek EA noted that the Jack Creek analysis area was considered to be a fragmented ecosystem because of past clear-cutting and road-building. Tr. at 484, lines 16–20.

81. The JC3 timber sale incorporated by reference much of Dr. Baker's work, and the USFS considered Dr. Baker's recommendations for restoration of a fragmented ecosystem, and designed the JC3 sale to address Dr. Baker's recommendations. Tr. at 429, 484.

82. Dr. Baker's paper was prepared after the 1985 MBNF Plan. Tr. at 429.

83. Dr. Baker did not provide comments on the Jack Creek EA. Tr. at 271.

84. Pursuant to the guidance of the Multiple Use Sustained Yield Act, the USFS is to manage national forests for multiple uses, including timber harvesting, and in a manner that ensures the forest is not harmed or detracted from the productivity of the land. Tr. at 401.

85. The JC3 timber sale will cause some short-term impacts to mature forest to eventually result in longer-term benefits for the MBNF. Tr. at 485. The Jack Creek EA noted that "[t]o better emulate pre-settlement vegetation patterns and patch size, harvest units have been concentrated in seven areas that have already had past timber sale entries to consolidate and/or begin creating larger stands of trees with similar species, makeup, age, and structures." AR at 4902.

86. In designing the JC3 Timber Sale, the USFS relied upon a field review conducted by scientists and research wildlife biologists from the University of Wyoming Zoology Department and the Forest Sciences Lab in Laramie, Wyoming. AR at 5011. The USFS did this to get feedback about how the Tie Camp project addressed issues such as wildlife habitats, fragmentation, watersheds, roads, and roadless areas and how harvest could be designed to lessen impacts. *Id.*

87. During the meetings between the USFS and these scientists and biologists, the scientists agreed that, on a broader scale, "in a managed forest it was good to clump new harvest with old. By doing so, larger patches of homogenous forested vegetation in younger age classes would be created [sic]. As these patches regenerate and mature over time, they will provide larger blocks of habitat in the future. Also by aggregating cutting units into smaller areas, fewer new roads would be needed and more areas of existing mature and old forest would be avoided and not be disturbed during this entry, thus providing habitat that would contribute to the immediate needs of some species such as the pine marten and boreal owl . . . ." *Id.*

88. The Jack Creek EA explained that "these considerations provide the rationale, and were incorporated into the design of the Jack Creek Timber Sale." *Id.*

89. In Dr. Baker's 1994 final report, he recommended that silvicultural practices could be used "to decrease the impacts of future timber harvesting on landscape,

structure, and even to a limited extent, to remedy some past effects." AR at 6123.

90. Dr. Baker's report explained that "aggregation of cutting units has been proposed as an effective silvicultural technique to decrease the effect of fragmentation when clearcutting (Li et al.1993). Using this approach, individual small cuts are placed sequentially so that a larger final patch is produced. This will decrease the overall fragmentation by cuts only if cutting units are concentrated in one area and other areas are left uncut to perpetuate interior habitat. An added benefit of the aggregation is a decrease in the length and density of necessary roads." Tr. at 6123–24.

91. Dr. Baker also advanced a protection approach which would limit cutting in the landscape. Tr. at 6121–23.

92. Dr. Baker's 1994 report recommended that fragmentation "[a]nalysis should include, as a matter of course, an assessment of the amount of interior habitat in old forest (by cover type) and the total area clearcut, cumulative area clearcut, and area affected by clearcuts and roads (e.g., Figs.7, 8) under each alternative." AR at 6126.

93. The Biological Evaluation ("BE") for the Jack Creek Timber Sale discussed Baker's definition of fragmentation as a decrease in interior habitat and an increase in patch density and perimeter. AR at 5680. The BE references Baker's 1994 paper, including his stated approaches to counter fragmentation and restore the landscape to its range of natural variability in a managed forest. AR at 5680.

94. The USFS followed Dr. Baker's recommended analytical approach. First, the Jack Creek analysis incorporates the Baker report which assesses the amount of interior habitat in each of 96 biological diversity analysis units ("BDU's") forestwide. AR at 5679–82, 6079. The JC3 area

corresponds to BDU 13. AR at 6192; Tr. at 289. The JC3 Timber Sale falls within the north end of BDU 13. Compare AR at 6141, 6192 to AR at 4893–94. Based upon Baker's analysis, there is little interior old growth or pre–1850 forest in the JC3 area. AR at 6201, 6212. The Baker report also assesses the amount of interior forest in the Jack Creek area by cover type. Id. at 6172. There are only zero to 62 acres of interior lodgepole pine forest in BDU 13, depending upon the depth of edge influence assumed from existing openings. AR at 6172.

95. Second, the JC3 EA displays the total area clearcut. AR at 4966. Third, the EA shows the cumulative area clearcut in map and tabular form indicating total acreage of past clearcuts. AR at 4955(map); 4961–62 (tables). Finally, the map shows the area affected by clearcuts and roads.

96. Dr. Baker testified that he did not know how large a patch size is needed to provide interior forest, although he thought a 100 acre circle would not be enough, as it would have to be "a very large area" to be ecologically significant. Tr. at 273–275. None of the proposed harvest units exceed 40 acres. See AR at 4905; Ex. I–33. Dr. Baker testified that his 1994 paper did not estimate the influence of roads on interior habitat and he did not offer an estimate of how much the roads in the JC3 sale area affect interior habitat. Tr. at 284–285. Dr. Baker testified that three one-third mile segments of new road built off an existing road would have less effect on interior forest than one new segment a mile long. Tr. at 282, 286. The new road construction in the JC3 sale is approximately 0.6 in three segments. AR at 5777.

## IX. Clear-cutting and Sustainability

97. The National Forest Management Act, 16 U.S.C. § 1601 et seq. ("NFMA"),

allows for clear-cutting, with the largest clear-cut allowed being 40 acres. Tr. at 411.

98. Clear-cutting is a harvest method that improves forest health by removing overstory that would create more mistletoe for a lodgepole pine stand. Tr. at 412–413.

99. The Jack Creek EA noted that moderate to high levels of dwarf mistletoe are present in 28% of the lodgepole pine strands within the Jack Creek analysis area, and there is a need to reduce the spread of this parasitic plant to improve and promote tree health and growth. Mistletoe deforms trees, causes rot, and weakens the tree so that it is more susceptible to insects and disease. AR at 4898.

100. Lodgepole pine generally regenerates in a very dense manner. Tr. at 417.

101. On the MBNF, lodgepole pine, spruce, and fir regenerate naturally. Tr. at 417.

102. While there are negative short-term visual impacts from clear-cutting, the trees in the MBNF regenerate and quickly create new, young, healthy forest. Tr. at 431, 433.

103. The long-term benefits of clear-cutting include reducing fuels for fire, forest health, and providing wood fiber for the nation in a manner that is ecologically sustainable. Tr. at 431.

104. Between 1994 and 2001, the USFS sold an average of 4.8 million board feet of timber per year from the MBNF. The MBNF is growing more than 4.8 million board feet per year. Tr. at 407, 433.

105. The unfinished TSDS stated that a sustainable harvest of timber on the forest (ASQ) would be about 7 million board feet per year. Tr. at 406–407.

106. The ASQ is set below Long Term Sustained Yield Capacity because of constraints other than the physical ability of trees to grow. Tr. at 527–529.

107. The Record of Decision to the 1985 plan noted that a schedule of timber sales for 1986 through 1995 was described in the attached Appendix A, and that the schedule was based on "current conditions and information and, if these conditions change or new information becomes available, the timber sales may be modified. . . . The exact amount of timber and the site-specific design and effects of these sales will be determined during project planning." AR at 12.

108. Current harvesting on the MBNF is within sustained yield. Tr. at 432–433.

109. The determination was made that implementation of the JC3 timber sale would not exceed the forest's sustained yield capacity. AR at 4986, 5005.

110. As to the JC3 sales, the issue of sustainability was briefly addressed in the Jack Creek EA, in response to comments. AR at 4986.

X. *Sensitive Species and the Jack Creek Timber Sale*

111. The Decision Notice and FONSI for the Jack Creek sale found that an EIS was not required for the sale. AR at 5049.

112. A sensitive species is a species on the regional forester's list, and for which one does not want to manipulate their habitat to where it would cause viability concern or a trend toward listing. Tr. at 496.

113. In BEs, the biologists take into consideration site-specific information that they know about the project area, surveys for sensitive species in those areas, and, if they do not find the species in the area, the biologists make assumptions about the effect on their habitat if the species come into the area, and the mitigation that can be provided to ensure they are not harmed. Tr. at 499.

114. The BE for Listed and Sensitive Reptile, Bird, Mammal and Plant Species for the Jack Creek sale concluded that the sale may affect individuals of sensitive species, but would not result in a loss of viability across the forest. Tr. at 496; AR at 5688.

115. The BE for the Jack Creek sale noted that there are no threatened, endangered, candidate, or other sensitive reptile species occurring in the proposed project area. AR at 5670.

116. The BE for the Proposed Jack Creek Timber Sale concluded that "the proposed action and the action alternatives to the proposed action may adversely impact individuals, but are not likely to result in a loss of viability on the Planning Area or cause a trend to federal listing or loss of species viability rangewide." AR at 6297.

117. The BE for the Jack creek sale analyzed the direct and indirect effects of the proposed sale on a number of species. AR at Vol. 14 at 5673—5676.

118. The BE for the Jack Creek sale also evaluated the habitat needs, distribution, and ecological needs for threatened, endangered, and sensitive species, including the Clustered Lady's-slipper, and found there were no known populations of the Clustered Lady's slipper in the analysis area. AR at 5700, 5712.

119. The BE for the Jack Creek sale also noted that goshawk/raptor surveys were conducted in the analysis area, nests were located, and all known nest locations were protected in the design of the alternatives and the proposed action. AR at 5704.

120. The BE for the Jack Creek sale notes that goshawk/raptor inventories have been conducted in the project area watersheds, and there are no known nests in the vicinity of any of the cutting units associated with the proposed action or any of the action alternatives. AR at 5684.

121. The BE for the Jack Creek sale noted that harvest of mature lodge-pole pine forest in the proposed action may impact individuals of certain species, including goshawks and Clustered Lady's-slipper, but the harvesting was not likely to result in a loss of viability on the Planning Area, nor cause a trend to federal listing or a loss of species viability rangewide. AR at 5689.

122. The USFS protects goshawks or Clustered–Lady's–slippers that are inventoried and recorded in an area. Tr. at 500.

123. At the pre-operations meeting for the JC3 sale, the USFS and the purchaser and the purchaser's employees would discuss which sensitive species the employees are to be aware of on the ground, and that operations must stop if a species is found. Tr. at 570.

124. The timber sale contract for the JC3 has a provision that sets up protective measures for the habitat of threatened, endangered, and sensitive species on the timber sale area. Tr. at 572–573; Govt. Ex. P.

125. The contract provision states that as the JC3 sale goes forward, if species are located that were not present previously, the USFS may cancel or unilaterally modify the timber sale contract. Tr. at 573; Govt. Ex. P.

126. The BE for the Jack Creek sale noted that direct or indirect effects of the timber sale would be negligible on the habitat of the pine marten and the golden-crowned kinglet, as no spruce-fir (i.e. these species' primary habitat) would be harvested. AR at 5674.

127. Pine martens generally use old spruce-fir and lodgepole pine forest. The most vital habitat areas for this species are spruce-fir stands at higher elevation in the southern part of watershed. Spruce-fir makes up only twenty-five percent of the

forest area in the watersheds, and no spruce-fir would be harvested in the JC3 sale. AR at 4958.

128. Harvest of mature lodgepole pine does not negatively affect habitat for pine marten in this watershed. AR at 4958.

129. As to the Canada Lynx, the USFS prepared a Supplemental Biological Assessment after the Jack Creek EA was completed in response to the proposal to list the Canada lynx. AR at 6269–6286.

130. The Supplemental Biological Assessment determined that "[t]he proposed action and its alternatives may affect Canada lynx but are NOT likely to jeopardize the continued existence of the species nor result in the destruction or adverse modification of critical habitat." AR at 6281. (Emphasis in original).

131. The USFS has issued a Notice of Intent to prepare an EIS in conjunction with an amendment to the MBNF land management plan and in response to the listing of the Canada lynx. 65 Fed.Reg. 40601 (2000).

132. With respect to the Jack Creek Timber Sale (which covers the Jack Creek # 3 and the Joes Park sales), the USFS consulted with the U.S. Fish and Wildlife Service ("FWS") regarding the listing of the Canada lynx as threatened. AR at 6335–6363; 6354 (specifically discusses Jack Creek Timber Sale).

133. The FWS determined it would be unlikely that the Jack Creek Timber Sale would adversely affect the lynx. AR at 6334.

134. In a May 21, 1999 guidance document, the FWS established the upward limit of elevation recommended for survey of the Preble's Meadow Jumping mouse as 8100 feet in Wyoming. Exh. A to Exh. 1 to Defs. Response Br.

135. The analysis area for the Jack Creek EA ranges in elevation from 8,200 feet to 10,600 feet. AR at Vol. 12 at 4895.

136. The BE—Proposed Jack Creek Timber Sale addressed the impacts of the Jack Creek project and associated activities on, among other species, the boreal toad. AR at 6296–97.

137. A Fisheries Specialist Report: Effects Jack Creek Project analyzed the possible direct and indirect impacts to boreal toad habitat from the Jack Creek project proposed action. AR at 6287, 6288–91.

138. The BE for the Jack Creek sale also analyzed cumulative effects, as did the Fisheries Specialist Report. AR at 5676–5688; AR at 6291–92.

139. The Fisheries Specialist Report concluded that "[n]either the Jack Creek proposed action nor the action alternatives to the proposed action constitute a detriment to fisheries and aquatic resources, riparian areas, and amphibians within and beyond the project area." Tr. at 6293–94. The report further noted that it was "reasonable to suggest [ ] that implementing any of the possible actions in the project area will have negligible short-term or long-term (10 years or more) impacts to aquatic resources." Tr. at 6294.

140. The BE for Jack Creek Timber Sale notes that there will be no impact on the mountain plover caused by the implementation of any of the proposed actions. AR at 5688.

141. The mountain plover is a species of the high plains and arid regions of western valleys and hills which generally avoids mountainous areas, preferring short-grass prairie. AR at 6300.

142. The USFS also prepared a Supplemental Biological Assessment ("BA") for the Jack Creek Timber Sale which addressed the mountain plover in response to the proposal to list it as a threatened species. AR at 6299. The Supplemental BA determined that "[t]here will be no direct or indirect effects on the mountain

plover since no habitat for this species occurs in the Jack Creek project area." Tr. at 6303.

143. The Specialist Report for Ecology and Wildlife for the Jack Creek timber sale noted that "the proposed Federal action will not affect any threatened, endangered, or proposed species," [and] "it will not jeopardize the continued existence of any listed or proposed species or [ ] result in the destruction or adverse modification of critical habitat." AR at 5649.

## XI. *Forest-wide Monitoring*

144. As required by 36 CFR 219.12(k), monitoring of the performance of the 1985 MBNF Plan began in 1986. AR at 3477.

145. The USFS monitoring reports address lynx (AR at 3571); mountain plover (AR at 3453–54); boreal toad (AR at 3517, 3453–540); and Preble's meadow jumping mouse. (AR at 3517, 3571).

146. The monitoring reports also point out that the Douglas ranger district monitored for black tailed prairie dog habitat during 1996 and noted that the black tailed prairie dog was determined to be warranted for listing. AR at 3517, 3624.

147. Annual monitoring reports evaluated 50 individual monitoring items from 1986 through 1999 to determine whether amendment or revision of the 1985 MBNF Plan was required. AR at 2411–3645.

148. Monitoring requirements by number included: (13) horizontal diversity; (14) vertical diversity; (15) Aspen retention; (16) old growth retention; (17) diversity of coniferous tree species; (20) Threatened and Endangered Species; (24) population and habitat trends of management indicator species; (30) Allowable Sale Quantity; (33) clearcut unit size; and (41) Forest road development. AR at 351–359.

149. Annual monitoring reports from 1986 through 1993 each specifically concluded that "no significant changes ... have occurred" and that a plan revision was not necessary. AR at 2420 (1986); 2485 (1987); 2559 (1988); 2633 (1989); 2709 (1990); 2918 (1991); 3015 (1992); 3158 (1993).

150. Annual monitoring reports for 1991 through 1999 note that a decision was made to revise the Plan and further note that the current plan will continue to be implemented until the revised Plan is completed. Beginning in 1994, the reports note complications in completing the revision on schedule. AR at 2919 (1991); 3016 (1992); 3159 (1993); 3249 (1994 (recounting consolidation of the Medicine Bow and Routt National Forests)); 3334 (1995 ("Ten Year Review" notes continuing delay)); 3429 (1996 (notes continuing delay)); 3493 (1997 (notes Congressional spending limitation)); 3550 (1998 (notes lift of Congressional ban and resumption of work on revision)); 3548 (1998 (continuation of plan implementation)); 3604 (1999 (notes new schedule)); 3602 (1999 (continuation of plan implementation)).

151. Sensitive species were addressed in the: 1995 monitoring report (AR at 3357); 1996 monitoring report (including Clustered–Lady's Slipper) (AR at 3454); 1997 monitoring report (AR at 3517); 1998 monitoring report (AR at 3571); and 1999 monitoring report (AR at 3623–24).

152. The 1992 Five Year Review monitoring report (1986–1990) did not make a finding that revision of the forest plan was required based on significantly changed conditions. In fact, the report came to the opposite conclusion: "Although the results of Monitoring during the years 1986 to 1990 showed no evidence that individual conditions or regional public demands have changed significantly enough on the Forest to require a Revision of the Forest Plan at this time, the Forest has decided to initiate the Revision process." AR at 2784.

153. Fragmentation was addressed in the 1992 Five Year Review monitoring report (1986–1990). AR at 2821.

## XII. *Management Indicator Species and Habitat Modeling*

154. The USFS often uses habitat capability models to measure the habitat and the amount of habitat affected by a proposed sale and to measure the impact on sensitive species. Tr. at 497.

155. The USFS has also imposed management area prescriptions across the MBNF which are managed in a different way to provide habitat for one or more management indicator species. Tr. at 497.

156. Management indicator species are species that represent a grouping of species that use similar habitats and have similar life requirements to sensitive species, and by ensuring habitat for management indicator species, the USFS ensures that there will be no viability concerns. Tr. at 498.

157. Pursuant to the 1982 planning regulations, the management indicator species is used to assure that the USFS is providing for the viability of species. Tr. at 497.

158. The Jack Creek Timber Sale EA and the Specialist Report Ecology and Wildlife for the Jack Creek Timber Sale adequately addressed management indicator species using habitat analysis, among other tools. AR at 4930–4932, 5628–5633.

159. Likewise, for the Bird Creek sale, the White Swan/Holmes EA, the Fall Creek/Bird Creek EA, and the Wildlife Resource Specialist Report for the Fall Creek/Bird Creek Analysis adequately addressed management indicator species using habitat analysis, among other tools. AR at 4602–4603, 4802–4805, 5552–5559.

## XIII. *Fragmentation and the Bird Creek Sale*

160. The Fall Creek/Bird Creek EA analyzed the effects of fragmentation and impacts on sensitive species, including the northern goshawk, and noted that the proposed action and one alternative may benefit the northern goshawk. AR at 4804.

161. This EA also recognized that the proposed action and one alternative may adversely impact individual sensitive species, but stated that the alternatives were not likely to result in a loss of species viability on the planning area, or cause a trend to federal listing or a loss of species viability range-wide. Tr. at 4804–05.

162. This EA also analyzed cumulative impacts on sensitive species, finding the proposed action and action alternatives would not likely result in a loss of species viability on the planning area, nor cause a trend to federal listing or a loss of species viability range-wide. Tr. at 4805 (citing BE).

163. This EA set forth planned actions to protect against forest fragmentation within the Fall Creek/Bird Creek analysis area under the proposed timber sales, including consolidating timber harvests, maintaining blocks of mature timber next to young stands, and implementing a road obliteration project. AR at 4762.

164. The EA summarized the five alternatives considered in detail—including the proposed action, as well as the four alternatives considered but eliminated from detailed study. AR at 4735–4737.

165. The EA then went on to discuss, in twenty-six pages and with several maps and charts, the alternatives to the proposed action. AR at 4758—4784.

166. The analysis included mitigation measures (AR at 4759–60), and the effects each of the five alternatives considered in

depth had on issues such as biological diversity and clearcutting. AR at 4783.

167. The EA notes that it is tiered to the "Integrated Resource Analysis" (IRA) for the Fall Creek and Bird Creek watersheds. AR at 4744.

168. The EA explains that "[t]he IRA is based on a Sustaining Ecological Systems (SES) process which uses a landscape scale approach to determine the relative health of forested, nonforested, and aquatic ecosystems." AR at 4744.

169. The USFS compared the area's historic conditions to existing and desired conditions to determine forest health, and then identified management opportunities that were designed to maintain, restore, or move toward the desired conditions while providing a full range of goods, services, and values. AR at 4744.

170. The EA further noted that desired conditions include vegetative diversity, and harvesting to consolidate clear-cutting, convert multi-storied mixed conifer stands into relatively young stands, and improve the health and resiliency of forested stands. *Id.*

171. The EA addresses cumulative impacts. AR at 4789–90.

172. The White Swan/Holmes EA notes that the proposed action is designed to meet the "desired condition for timber, water, and forest protection." AR at 4552.

173. The White Swan/Holmes EA lists the goals for the proposal, which include providing for timber harvest to support local industries, and monitoring the effects of insect and disease. AR at 4552–53.

174. The White Swan/Holmes EA discusses fragmentation (AR at 4596) and analyzes biodiversity (AR at 4595–4606) and addresses cumulative impacts. (AR at 4587–88).

175. The EA identifies fragmentation as a component of biological diversity, and concludes that "[b]ecause no clearcutting

would occur, none of the alternatives would affect the desired future condition for old growth, linkages, and/or corridors." AR at 4596.

## XIV. Sustainability and the Bird Creek Sale

176. The EA for the Fall Creek/Bird Creek sales did not address the issue of non-sustainability and allowable sale quantity, finding that "[t]his is a Forest-wide issue and cannot be addressed at the project level." AR at 4875.

177. The Appeal Reviewing Officer ("ARO") decision for the Fall Creek/Bird Creek Decision Notice and FONSI did address the issue of sustainability, finding that the USFS had adequately addressed the issue in working papers located in the Appeal Record and in the Banner Supplemental Information Report. AR at 5230 (The Banner Supplemental Information Report is located in the AR at 4425).

178. The ARO decision specifically compared the volume of timber authorized by the Fall Creek/Bird Creek project to the ASQ, and the amount of timber sold in 1986 and 1996. *Id.* The ARO decision concluded that the project will not contribute to harvesting timber non-sustainability. *Id.*

## XV. Sensitive Species and the Bird Creek Sale

179. As to the Bird Creek sale, the BE for the Fall Creek/Bird Creek Timber Sale listed the North American lynx (same as Canada lynx) as an endangered, threatened, or sensitive species that may occur in the Fall Creek/Bird Creek watersheds, but did not list it as such a species known to occur, or with the potential to occur, in the analysis area. AR at 5597–98.

180. The BE for the White Swan/Holmes Timber Sale drew the same conclusions as to the presence of the North

American lynx in the watersheds and analysis area for that sale. AR at 6310–11.[1]

181. The BE for the Fall Creek/Bird Creek sales notes that the Preble's Meadow Jumping Mouse may exist in the Fall Creek/Bird Creek watersheds, but determined that it is not known to occur, nor has the potential to occur, in the analysis area. AR at 5597–98.

182. The BE for the White Swan/Holmes timber sale notes that while the Preeble's Meadow Jumping Mouse may occur in the White Swan/Holmes watershed, it is not listed as known to occur or with the potential to occur in the analysis area. AR at 6309–11.

183. The Fall Creek/Bird Creek BE notes the existence of the boreal toad in the area (AR at 5603), but determined that the toad's habitat "will experience no change" from the implementation of any of the alternatives listed in the EA. AR at 5611.

184. The BE for the White Swan/Holmes timber sale notes that the western boreal toad has the potential to occur in the analysis area, discussed the habitat of the toad and the surveys the USFS performed in the area, and determined that implementation of the proposed alternatives would have no impact on the toad. AR at 6310–11, 6322–23, 6327.

185. The White Swan/Holmes EA area ranges in elevation from 8,250 feet to 10,-360 feet. AR at 4588.

186. The BE for the Fall Creek/Bird Creek Timber Sale notes that mountain plover may occur in the area, and that it is a candidate species for listing. AR at 5597–98.

187. The White Swan/Holmes EA addressed sensitive species. AR at 4605.

188. The BE for Fall Creek/Bird Creek Timber Sale determined that "[t]here will be no direct or indirect effects caused by implementation of any of the proposed alternatives on any threatened or endangered species as suitable habitat does not exist." AR at 5610. *See also* AR at 5591 (Wildlife Resource Specialist Report for Fall Creek/Bird Creek sale).

189. The BE for the White Swan/Holmes timber sale reviewed the effects of the proposed sale and alternatives on threatened, endangered, or sensitive species, and set forth its determination, noting there would be no impact from any of the proposed alternatives on threatened or endangered species or their habitat known to occur within the analysis area. AR at 6327.

## XVI. Five-year Timber Sale Action Plan

190. The USFS issued a "Five–Year Timber Sale Action Plan" on April 6, 1995. AR at 5527.

191. The USFS issued another "Five Year Timber Sale Action Plan" on February 20, 2001. AR at 5744.

192. Text on pages of this plan state "draft" and "very draft." AR at 5744, 5748.

## XVII. Exhaustion of Administrative Remedies

193. Plaintiffs Biodiversity Associates and Friends of the Bow administratively appealed both decision notices pursuant to 36 C.F.R. § 215, but plaintiff Leila Bruno did not. AR at 5109, 5141, 5196, 5258.

194. Plaintiffs did not raise the arguments in paragraphs 182, 189, and 190 of the Second Amended Complaint in their

---

1. The White Swan/Holmes EA proposed and analyzed units that make up a portion of the Bird Creek timber sale at issue here.

administrative appeals of the Bird Creek sale. AR at 5109, 5141, 5196.

195. Plaintiffs did not raise the arguments in paragraphs 182, 189, and 190 of the Second Amended Complaint in their administrative appeals of the Joes Park and JC3 sales. AR at 5258, 5400.

196. As to the claims raised in paragraph 113, as they relate to Count I, plaintiffs have failed to exhaust their administrative remedies as to the Bird Creek sale. AR at 5109, 5141, 5196.

197. As to the claims raised in paragraph 113, as they relate to Count I, and the Joes Park and JC3 sales, Plaintiffs have failed to exhaust their administrative remedies that the USFS must supplement the programmatic EIS, and Plaintiffs have failed to exhaust their administrative remedies that the programmatic EIS must be revised to account for information in the 1991 New Direction for the '90's document and the 1992 Monitoring Report. AR at 5267–73,5408–15. As to the claims listed in the third, fourth, fifth, sixth, and seventh bullets of Count III of the Second Amended Complaint, Plaintiffs have failed to exhaust their administrative remedies as to the Bird Creek sale. AR at 5109, 5141, 5196.

198. As to the claims listed in the fourth bullet of Count III of the Second Amended Complaint, Plaintiffs have failed to exhaust their administrative remedies as to the Joes Park and JC3 sales. AR at 5258, 5400.

199. As to the actions listed in the third bullet of Count III of the Second Amended Complaint, Plaintiffs did not exhaust their administrative remedies to the argument that, for the Joes Park and JC3 sales, seeking either supplementation of the 1985 EIS or that such supplementation has been unlawfully withheld or unreasonably delayed. AR at 5273, 5415.

200. The headings and text of Plaintiffs' Notices of Appeal for the Joes Park and JC3 sales do not characterize the issue raised in the sixth bullet of Count III of the Second Amended Complaint as agency action unlawfully withheld or unreasonably delayed. AR at 5293–5307, 5437–50.

201. As to the Bird Creek sale, Plaintiffs failed to exhaust the argument at the appeal level that the 1985 programmatic EIS is now flawed under NEPA for the USFS's failure to timely revise the forest plan. AR at 5141, 5196.

## Analysis and Conclusions of Law

### I. Plaintiffs' NFMA Claims

#### A. Effect of Sec. 327

1. Of primary concern in this action is the fact that the 1985 MBNF Plan has not been revised within the fifteen year deadline set out by Congress in NFMA. 16 U.S.C. § 1604. On November 5, 2001, after the instant litigation was filed and fully briefed, President Bush signed into law H.R. 2217, the Department of the Interior and Related Agencies Appropriations Act for Fiscal Year (FY) 2002. Section 327 of the law reads as follows:

> Revision of Forest Plans. Prior to October 1, 2002, the Secretary of Agriculture shall not be considered to be in violation of subparagraph 6(f)(5)(A) of the Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. 1604(f)(5)(A)) solely because more than 15 years have passed without revision of the plan for a unit of the National Forest System. Nothing in this section exempts the Secretary from any other requirement of the Forest and Rangeland Renewable Resources Planning Act (16 U.S.C. 1600 et seq.) or any other law: Provided, That if the Secretary is not acting expeditiously and in good faith, within the funding available, to revise a

plan for a unit of the National Forest System, this section shall be void with respect to such plan and a court of proper jurisdiction may order completion of the plan on an accelerated basis. P.L. 107–63, § 327; 115 Stat. 414 (107th Cong., 1st Sess., 2001) (hereafter "Sec. 327").

2. The starting point of statutory interpretation is to review the plain language of the statute itself, as well as its overall design. *See In re Overland Park Financial Corp.*, 236 F.3d 1246, 1251–52 (10th Cir.2001). Courts should not resort to legislative history to ascertain Congress' intent when the plain language of the statute is unambiguous. *See United States v. Gonzales*, 520 U.S. 1, 6, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) ("Given [a] straightforward statutory command, there is no reason to resort to legislative history") (citation omitted); *United States v. Thompson*, 941 F.2d 1074, 1077 (10th Cir.1991) (" 'The starting point in every case involving construction of a statute is the language itself' ") (citations omitted).

3. Congress put Sec. 327 into effect in order to preclude countless lawsuits against the USFS based merely upon the fact that many National Forest Plans are past their fifteen year deadline for revision. To the extent that this suit is based solely upon the passage of the fifteen year deadline, Plaintiffs' claim is void at the present time. However, the Court is in the unusual position of issuing its opinion on the verge of the expiration of Sec. 327. The Court does not wish to find virtually the same lawsuit before it after the expiration of Sec. 327 when the evidence that it needs to decide the merits that would form the basis of this claim have already been extensively analyzed as part of this lawsuit. Such a situation would be a waste of judicial resources, and so the Court will look to the merits of Plaintiffs' claims regarding the fifteen year deadline.

4. The Court notes that the language of Sec. 327 goes on to say that if the USFS is not acting expeditiously and in good faith, within the funding available, to revise a plan, Sec. 327 is void and a Court may order the completion of the revision on an accelerated basis. Based upon the testimony of Mary Peterson, the MBNF Supervisor, and the evidence before the Court regarding the progress being made on the revision of the MBNF Plan, the Court finds that the USFS is acting expeditiously and in good faith, at least since the passage of Sec. 327. The Court only examined the USFS's actions after the passage of Sec. 327 to come to this conclusion since the purpose of the legislation was to address the fact that numerous forest plans were overdue, and thus arguably, prior to Sec. 327, the USFS was not acting expeditiously or in good faith as to those overdue plans. Sec. 327 was passed in response to the realization that numerous plans were past time for revision, and if the USFS had always been acting expeditiously and in good faith, the legislation would arguably have been unnecessary as the plans would have been revised. Therefore, it would not be logical for the Court to look to the actions of the USFS before the passage of Sec. 327 in order to make a determination of whether they were acting expeditiously and in good faith. Also, the language of Sec. 327 is in present tense "*is* acting expeditiously"— not "*was* acting expeditiously" and the Court shall be guided by the plain language of a law when making its determinations.

## B. Remedy for Failure to Revise the MBNF Plan under NFMA

5. As stated above, pursuant to NFMA, Congress has stated that forest plans are to be revised "from time to time when the Secretary finds conditions in a unit have significantly changed, but at

least every fifteen years." 16 U.S.C. § 1604(f)(5).

6. Plaintiffs contend that the USFS "found" that significantly changed conditions warranted revising the Forest Plan by 1995 pursuant to NFMA, 16 U.S.C. § 1604(f)(5). 2nd Amd. Compl. at ¶ 185. Plaintiffs further contend that, based on this purported finding, NFMA required the plan to be revised. 16 U.S.C. § 1604(f)(5).

7. Plaintiffs' characterization of the facts is incorrect. While the USFS has maintained a close watch on the implementation of the Plan, it has never stated that it "found" that conditions on the MBNF had significantly changed. In fact, substantial evidence in the record indicates that the opposite is actually true. *See* Findings of Fact, supra, 147–150, 152. While it is true that the USFS had voluntarily decided to revise the Plan before the fifteen year date, this was not based on a finding that the conditions on the MBNF had significantly changed—thus mandating a revision under NFMA. The voluntary decision was made by the Forest Leadership Team that such a revision schedule was "more consistent with NFMA." AR at 3477. Though the USFS had admirable intentions, things outside of its control occurred, such as the combination of the Routt Forest and MBNF, as well as various budget cuts—which ultimately dashed their grandiose dreams of an early revision. Therefore, Plaintiffs' contention that the USFS found significant changes in conditions on the MBNF mandated an early revision of the Plan is erroneous.

8. Pursuant to NFMA, the MBNF Plan is past its time for revision. This is undisputed. As stated above, despite the effects of Sec. 327, the Court will look at the effect of this failure to revise. Congress prescribed a time for revision of forest plans in 16 U.S.C. § 1604(f)(5). However, Congress did not explain the consequences for a failure to revise on the fifteen year schedule. Therefore, it is the task of this Court to decide upon a remedy for the failure to revise the Plan within fifteen years. Plaintiffs argue that the failure to revise the Plan should result in an injunction against the Jack Creek and Fall Creek/Bird Creek timber sales on the MBNF until such time as the USFS reconsiders the adequacy and appropriateness of these timber sales in the context of the revised Plan and revised programmatic EIS. Plaintiffs ask this Court to, in effect, cease timber production on the MBNF and create a precedent for cessation of timber production on all National Forests that are currently without a current forest plan, until all of the outdated forest plans are finally revised. The implications of this Court taking such an action would be devastating to the Nation's economy and wood supply, and the Court cannot believe that this is what Congress intended in enacting NFMA.

9. The Court's primary task in construing statutes is to "determine congressional intent, using 'traditional tools of statutory interpretation.'" *New Mexico Cattle Growers Association v. U.S. Fish and Wildlife Service*, 248 F.3d 1277, 1281 (10th Cir.2001)(quoting *NLRB v. United Food & Commercial Workers Union*, 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987); *INS v. Cardoza–Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)). "As in all cases requiring statutory construction, 'we begin with the plain language of the law.'" *St. Charles Investment Co. v. CIR*, 232 F.3d 773, 776 (10th Cir.2000) (quoting *United States v. Morgan*, 922 F.2d 1495, 1496 (10th Cir.1991)). "In so doing, we will assume that Congress's intent is expressed correctly in the ordinary meaning of the words it employs.... Where the language of the statute is plain, it is improper for this Court to consult legislative history in determining

congressional intent." *New Mexico Cattle Growers*, 248 F.3d at 1282. However, where "the statutory language is ambiguous, a court can then resort to legislative history as an aid to interpretation." *United States v. Simmonds*, 111 F.3d 737, 742 (10th Cir.1997). Here, the remedy for a missed revision deadline is not included in the statute; therefore, it is appropriate for the Court to look to legislative history to determine Congress' intent.

When Congress enacted NFMA in 1976, it imposed the requirement that the Secretary of Agriculture develop management plans for the National Forest System. 16 U.S.C. § 1604(a). However, Congress recognized that it would take time for these plans to be developed, and expressly stated that the Secretary should incorporate the standards and guidelines in NFMA "as soon as practicable," and should complete such incorporation no later than September 30, 1985. 16 U.S.C. § 1604(c). NFMA also stated that until such time as a unit of the National Forest System is managed under plans developed in accordance with NFMA, "the management of such unit may continue under existing land and resource management plans." *Id.* While 1604(c) was directed at governing the state of affairs at the time NFMA was enacted, it is evidence that Congress never intended that the statute and its provisions should have the effect of ceasing all operations in a National Forest when a plan was not in place (or, as here, timely revised). For this Court to require that action such as the timber sales at issue here cease would be counter to the intent of Congress.

NFMA also provides that "when land management plans are revised, resource plans and permit contracts, and other instruments, when necessary shall be revised as soon as practicable." 16 U.S.C. § 1604(i). This language further enforces the conclusion that Congress recognized that things should continue to progress while a plan is in the process of revision, and that planning is an ongoing process, where circumstances continue to change and the plans and documents that rely thereon shall continually be in flux as well. Congress did not proscribe a sudden cessation in all work on the National Forest in anticipation of a new Plan, and the Court will not impose one here where it would be improvident at best.

Subsequent legislation continues to demonstrate Congress' intent that the failure to prepare plans in a timely manner under NFMA did not require cessation of all activities affecting those National Forests. While "[t]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier [Congress]" (*State of Wyoming v. Udall*, 379 F.2d 635, 639 10th Cir.1967), such evidence can be legitimately used for its persuasive value, particularly when such evidence is consistent with the evidence of the intent of the enacting Congress. *Rettig v. Pension Guaranty Corp.*, 744 F.2d 133, 149 n. 43 (D.C.Cir.1984). The 1976 enactment of NFMA stated that September 30, 1985 was the date by which the USFS was to have all plans in place. 16 U.S.C. § 1604(c). However, by September of 1986, 69 of the 123 National Forests did not have plans in place. *See* Defs' Mem. in Supp. of Mot. for Summ. J., Ex. 3. In appropriations acts dated 1986, Congress explicitly stated that the USFS was to continue to complete as expeditiously as possible development of the plans to meet all applicable statutory requirements, but that notwithstanding the date set forth in 16 U.S.C. § 1604(c), the USFS could continue to manage the forests under existing land and resource management plans pending the completion of new plans. *See* Pub.L. 99–500, 99–591; 16 U.S.C. § 1604 Historical and Statutory Notes. Virtually identical language was contained in appro-

priations acts dated 1987, 1988, and 1989. *See* Pub.L. 100–202, 100–466, 101–121. Such language clearly expresses that Congress did not intend that missed statutory deadlines within NFMA would halt all action on the National Forests. The Court finds that this intention should also apply to the case at bar, and any other result would be detrimental to the public.

10. Case law also supports the proposition that the failure of the USFS to meet the statutory deadline for revision of the MBNF Plan does not mean that the USFS is consequently disabled from all action as a result of the missed deadline. In *Gallagher v. National Transportation Safety Board,* 953 F.2d 1214 (10th Cir.1992), a pilot petitioned the court for review of an order of the National Transportation Safety Board affirming the revocation of his airman certificate and airline transport privileges. The Tenth Circuit found that the Board's failure to finally dispose of pilot's appeal from the Federal Aviation Administration (FAA) emergency order within the statutorily prescribed time limit did not divest the Board of jurisdiction to complete its appeals process. *Id.* Such is similar to the case at bar in that the failure of the USFS to revise the Plan within the statutorily prescribed time should not divest the USFS of its power to continue to administer activities on the MBNF. In discussing the effect of the applicable statute's language which included a mandatory time limit proscribed by the use of the word "shall," the *Gallagher* court said:

Congress obviously intended by its use of such imperative language that the [Board's] failure to comply with the mandate would have some consequence. What precisely Congress intended that consequence to be is not explicit in the statute. However, our conclusion that Congress did not intend to deprive the [Board] of jurisdiction to complete appeals pending before it in the event the sixty-day period is exceeded is consis-

tent with the recent teachings of the United States Supreme Court regarding the appropriate construction of statutory time limits such as are here involved. In *Brock v. Pierce County,* 476 U.S. 253, 260, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986), The Court held that the 120–day statutory time limit then part of section 106(b) of the Comprehensive Employment and Training Act ("CETA"), 29 U.S.C. § 816(b) (1976, Supp.V), was not jurisdictional. Under CETA, the federal government provided grants to qualifying entities for the implementation of programs to provide "job training and employment opportunities for economically disadvantaged, unemployed, or underemployed persons." 29 U.S.C. § 801 (1976 ed., Supp. V). Section 106(b) required that, if the Secretary of Labor had reason to believe that any CETA grant recipient was misusing CETA funds or otherwise violating applicable regulations, the Secretary "shall investigate the matter" and "shall" determine the truth of the allegation not later than 120 days after receiving the complaint. 29 U.S.C. § 816(b) (1976 ed. Supp. V). In holding that the Secretary's failure to comply with the 120–day period was not jurisdictional, the Court explained: "This Court has frequently articulated the 'great principle of public policy, applicable to all governments alike, which forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided.' We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake. When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act."

*Pierce County,* 476 U.S. at 260, 106 S.Ct. 1834. The Court further observed that, under the facts of *Pierce County,* there was at least one available remedy less drastic than divesting the Secretary of Labor of jurisdiction to complete the investigation. Specifically, the Court noted that, under the Administrative Procedures Act, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed." *Id.* at 260 n. 7, 106 S.Ct. 1834 (quoting 5 U.S.C. § 706(1)). Therefore, any party aggrieved by the Secretary's failure to comply with the statutory time-limit would have the right to enforce its rights by initiating an action in district court. *Id.* We see no reason why persons aggrieved by the NTSB's failure to comply with the statutory time limits for addressing appeals would not be entitled to a similar remedy.

*Gallagher,* 953 F.2d at 1221–22 (citations omitted). *Gallagher* is informative for the case at bar. Here, the Court finds that the USFS's failure to abide by a mandatory time limit for revising the MBNF's Plan does not require that the USFS loses its ability to act with regard to the MBNF. Just as in *Pierce County* and *Gallagher,* Plaintiff's have a less drastic method of redressing the USFS failure, namely the APA as stated in *Gallagher.* Plaintiffs ironically have indeed brought claims under the APA for actions unlawfully withheld or unreasonably delayed, and those claims will be discussed *infra.*

The *Gallagher* court also went on to examine another case in which an agency failed to meet a mandatory deadline:

United States v. Montalvo–Murillo, 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990) ... involved a procedural provision of the Bail Reform Act requiring that a detention hearing for criminal suspects be held upon the suspect's first appearance before a judicial officer. *Id.* (citing 18 U.S.C. 3142(f)). The appellant in the case was a criminal defendant who did not receive a detention hearing until fifteen days after his arrest and after he had appeared on two occasions before federal magistrates in two jurisdictions. *Id.* On appeal from a magistrate's order allowing the appellant to be released upon a $50,000 bond, the district court agreed that the appellant should have been detained, but ordered the release of the appellant on the grounds that the procedural timing requirements of section 3142(f) had not been satisfied and that pre-trial release was the appropriate remedy for violation of the statute. 713 F.Supp. 1407, 1414–15 (D.N.M.1989). This court affirmed. 876 F.2d 826, 827 (10th Cir.1989). The Supreme Court reversed, holding that the remedy for violation of the statutory procedural requirement was not the mandatory release of the aggrieved defendant. In so holding, the Court cited its decision in *Brock v. Pierce County,* and concluded: "In similar manner, in this case the word 'shall' in the Act's hearing time requirement does not operate to bar all authority to seek pretrial detention once the time limit has passed. Although the duty is mandatory, the sanction for breach is not loss of all later powers to act." *Montalvo–Murillo,* 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720. Thus, even when significant private interests are threatened by the government's failure to comply with statutorily prescribed time requirements, the Court has refused to conclude that the government loses its authority to ultimately perform its function.

*Gallagher,* 953 F.2d at 1223 (citations omitted). Although the USFS's duty to revise within fifteen years, the sanction for breach is not the loss of all powers to act. The USFS retains the authority to perform its function of administering the MBNF, including continuing to make tim-

ber sales, as long as those comply with other environmental laws, including NEPA. Therefore, for all the aforementioned reasons, Plaintiffs' claims as they relate to enjoinder of USFS actions that are based upon or tiered to the 1985 MBNF Plan and programmatic EIS are **DENIED**. The proper remedy for the USFS's failure to meet the fifteen year deadline for revision of the Plan is not for this Court to halt all USFS actions taken pursuant to the Plan and programmatic EIS. A less drastic remedy is available under the APA and will be discussed *infra.*

## II. Plaintiffs' NEPA Claims

### A. The USFS's Two-step Planning Process

11. Plaintiffs contend that the 1985 programmatic EIS should be supplemented to account for significant new information which plaintiffs claim has arisen since the 1985 Plan was approved.

12. Under the USFS's two-step planning process, the USFS addressed new information both at the project level and Forest-wide. AR at 4548, 4727, 4883; Tr. at 428–29; Findings of Fact, *supra,* 148–151. The question for the court is whether the USFS's consideration of the new information was adequate under the regulations of the Council on Environmental Quality ("CEQ") given the statutory scheme set forth in the NFMA and its implementing regulations.

13. The National Environmental Policy Act, ("NEPA"), 42 U.S.C. § 4321 *et seq.,* mandates the procedures by which agencies must consider the environmental impacts of their actions, but does not dictate the substantive results of that consideration. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 371, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

14. An agency's obligation to supplement its NEPA analysis is not expressly addressed in the statute, but rather in the CEQ regulations which require an agency to prepare supplements if, among other things, there "are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii).

15. In contrast, NFMA expressly contemplates monitoring the original forest plan (16 U.S.C. § 1604(g)(3)(C)) and keeping the plan updated through amendment or revision (16 U.S.C. § 1604(f)(4) & (5)). Moreover, NFMA expressly requires compliance with NEPA. 16 U.S.C. § 1604(g)(1).

16. The Supreme Court has described the decision on whether supplementation of NEPA analysis is needed as governed by a "rule of reason," recognizing that "an agency need not supplement an EIS every time new information comes to light" as such a requirement would "render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

17. If new information sufficiently demonstrates that an action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared. *Marsh,* 490 U.S. at 374, 109 S.Ct. 1851.

18. The determination of the environmental significance of new information involves issues of fact requiring "a high level of technical expertise" for which reviewing courts typically defer to agency expertise. *Id.* at 377, 109 S.Ct. 1851 (quoting *Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976)). Where experts express conflicting views, the USFS is entitled to rely on its own experts even if the "court might find con-

trary views more persuasive." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851.

19. The decision is reviewed under the "arbitrary and capricious" standard of the APA, 5 U.S.C. § 706(2)(A). *Ross v. Federal Highway Admin.,* 162 F.3d 1046, 1050 (10th Cir.1998). It is plaintiffs' burden to show that the USFS acted in a manner contrary to the APA. *San Luis Obispo Mothers for Peace v. U.S. Nuclear Regulatory Comm'n,* 789 F.2d 26, 37 (D.C.Cir.), *cert. denied,* 479 U.S. 923, 107 S.Ct. 330, 93 L.Ed.2d 302 (1986).

20. As long as the agency's decision not to prepare a supplemental EIS is not arbitrary or capricious, the decision should not be set aside. *Marsh,* 490 U.S. at 377, 109 S.Ct. 1851. A court must consider whether the decision was based on a "consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 378, 109 S.Ct. 1851; *accord, Ross,* 162 F.3d at 1050. While the court's review must be "searching and careful," the "ultimate standard of review is narrow." *Marsh,* 490 U.S. at 378, 109 S.Ct. 1851.

21. As long as the record demonstrates that the USFS reviewed the proffered new information, evaluated the significance or lack of significance of the new information, and provided an explanation for its decision not to supplement the existing analysis, the court must uphold the agency's decision. *Colorado Environmental Coalition v. Dombeck,* 185 F.3d 1162, 1177 (10th Cir.1999). The court cannot substitute its judgment for that of the agency. *Ross,* 162 F.3d at 1050.

22. NEPA should be harmonized with other statutory schemes. *Kilroy v. Ruckelshaus,* 738 F.2d 1448, 1454 (9th Cir. 1984) (NEPA did not require extensive development and discussion of alternatives where alternatives may have been inconsistent with the Marine Protection Act and the Clean Water Act). Congress specifically intended that the NFMA and NEPA schemes be harmonized. 16 U.S.C. § 1604(g)(1) (Requiring plans to be prepared "in accordance with [NEPA], including, but not limited to, direction on when and for what plans an environmental impact statement ... shall be prepared.").

23. NFMA requires the USFS to develop Forest Plans by which to manage each National Forest under multiple-use and sustained-yield principles. 16 U.S.C. § 1604(e). *Colorado Environmental Coalition,* 185 F.3d at 1167.

24. "Forest management then occurs at two distinct levels. [Citation omitted]. At the first level, the Forest Service develops the Forest Plan, a broad, programmatic document accompanied by an environmental impact statement ...." *Colorado Environmental Coalition,* 185 F.3d at 1167-68. At the second level, "the Forest Service is required to implement the forest plan by approving or disapproving specific projects. Projects must be consistent with the governing forest plan and subject to the procedural requirements of NEPA. 16 U.S.C. § 1604(i)." *Lamb v. Thompson,* 265 F.3d 1038, 1042 (10th Cir.2001).

25. This two-step planning process does not contemplate direct review of the broad programmatic Forest Plan absent reference to the second stage where that Plan is implemented through on-the-ground management and further NEPA compliance. *See generally, Colorado Environmental Coalition, supra,* at 1167-68; *Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 729-30, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998).

26. The EAs for the Jack Creek sales and for the Bird Creek sale considered each item of information which plaintiffs allege to be new and significant, in-

cluding fragmentation, Threatened and Endangered Species, Sensitive Species, and Management Indicator Species, and sustainability.[2] Findings of Fact, *supra,* sections VIII, XV. Having considered these issues (with the exception of sustainability in the Bird Creek EA), the decision notices for the sales concluded with a Finding of No Significant Impact. AR at 4534, 4875, 5035.

27. The various documents alleged to impart the significant new information are not "new" because they all pre-date the EAs. Moreover the agency experts examined the information and found that it was not "significant" in the project level context. In spite of the contrary opinions of plaintiffs' experts, the USFS is entitled to rely on the opinions of its own experts under these circumstances. *Marsh* 490 U.S. at 378, 109 S.Ct. 1851.

28. Turning again to the structure of the NFMA scheme, it also provides for consideration of new information at the Forest Plan level. Implementation of the Forest Plan must be periodically monitored and evaluated. 16 U.S.C. § 1604(g)(3)(c); 36 C.F.R. §§ 219.11(d), 219.12(k) (1999).[3] Based on such evaluation, an interdisciplinary team is to recommend changes in management direction, amendments, or revisions. 36 C.F.R. § 219.12(k). A significant amendment or revision requires compliance with the same procedure as that for development and approval of a forest plan, including preparation of an EIS. 36 C.F.R. § 219.10(b)(EIS), (f)(amendment) and (g)(revision). Revision of the Forest Plan and its accompanying EIS is well under way with a projected completion date in

the Fall of 2003. Finding of Fact, *supra,* 1294, 1295.

■ 29. While the USFS must prepare an EIS when it decides to revise a Forest Plan, it need not supplement the existing Forest Plan EIS pending the revision if it˙ has taken a hard look at the environmental effects of the new information and made a reasoned decision not to prepare a supplemental EIS. *Idaho Sporting Congress, Inc. v. U.S. Forest Service,* 31 F.Supp.2d 1236 (D.Idaho 1996).

■ 30. "Not every item of new evidence requires a formal EIS or supplement. There are other and less cumbersome ways for an agency to evaluate new information and explain why it finds no need for a new EIS." *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1027 (9th Cir.1980) (Kennedy, J., concurring in opinion that agency satisfied "hard look" standard under NEPA by relying on studies of new information which determined that new information did not require supplementation of SEIS). The NFMA statutory scheme provides a "less cumbersome way" for the consideration of such information through the two-stage planning process. At the Forest-wide scale, new information is collected and evaluated through the monitoring and evaluation reports. It is appropriate to rely on these reports to conclude that, while a Forest Plan revision may be necessary in the future, supplementation of the Plan EIS is not necessary. *Idaho Sporting Congress,* 31 F.Supp.2d at 1238, 1241.

31. As indicated in Findings of Fact, *supra,* 147—150, 164, the annual monitoring reports and the five and ten year

---

2. While the Bird Creek EA did not address the issue of sustainability, it was addressed as part of the administrative appeal. *See* Findings of Fact, *supra,* 176–178.

3. While the NFMA implementing regulations were revised in November of 2000 at 65 Fed. Reg. 67568 (2000), the earlier regulations govern here because the three timber sale decisions at issue were made before November of 2000.

reviews also considered many aspects of the information which Plaintiffs allege to be new and significant. Annual monitoring evaluation reports are required by the 1985 Plan. AR at 351–52. The regulations require the five and ten year reviews. 36 C.F.R. § 219.10(g). The annual monitoring reports evaluated 50 separate items at the Forest Plan level including: threatened, endangered and sensitive species, management indicator species; Allowable Sale Quantity and the Timber Demand and Supply Study; old growth and Aspen retention; horizontal and vertical diversity; diversity of coniferous tree species; clear cut unit size; and forest road development.

32. Plaintiffs' staff biologist, Erik Molvar, testified that "science marches on at a continual pace and there are thousands of studies that are released every year" since the 1985 Forest Plan EIS was completed. Tr. at 312–13. Forest Supervisor Mary Peterson also testified that, to impose the burden on the Forest to consider all of that information at the plan level would result in an "endless do loop." Tr. at 428–29. This would ignore the statutory and regulatory structure of the NFMA and its two-stage planning process. Clearly this would "render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

33. Given that Plaintiffs merely make allegations that the USFS failed to consider new information versus the fact that the USFS did actually consider many aspects of the allegedly new and allegedly significant information both at the forest-wide level and at the site specific level, a hard look at the environmental effects of the new information was taken and it was not necessary to supplement the 1985 programmatic EIS. To hold otherwise would be to shift the burden of proving the alleged NEPA violation from plaintiffs, where it belongs, to the USFS. *See Davis v. Mineta,* 302 F.3d 1104, 1111–13 (10th Cir.2002); *Sierra Club v. Lujan,* 949 F.2d 362, 369 (10th Cir.1991).

34. Under the CEQ regulations, the Plan is an existing program statement that is undergoing revision. The program actions can continue while the plan is being revised. 40 C.F.R. § 1506.1; *ONRC Action v. Bureau of Land Management,* 150 F.3d 1132, 1138 (9th Cir.1998). Timber sale analysis can address the issues of fragmentation, sensitive species, and wildlife viability apart from the forest plan. *Oregon Natural Resources Council v. Lowe,* 109 F.3d 521, 528–30 (9th Cir.1997) (rejecting claim that Forest Service failed to address "fragmentation and edge effect of biological corridors" and holding that Forest Service could use a timber sale environmental document to evaluate habitat distribution and viability of wildlife species); *Friends of the Bow v. Thompson,* 124 F.3d at 1217 (plan level concerns may be considered at the time of an individual sale decision). The USFS need not supplement the existing Plan EIS pending the revision if it has taken a hard look at the environmental effects of the new information. *Idaho Sporting Congress, Inc. v. U.S. Forest Service,* 31 F.Supp.2d 1236 (D.Idaho 1996).

35. Plaintiffs' allegations that the forest plan EIS is "antiquated" fail to account for the two-step planning process approved by the Tenth Circuit, and acknowledged by the Supreme Court in *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726, 729–30, 118 S.Ct. 1665, 140 L.Ed.2d 921. *See Colorado Environmental Coalition,* 185 F.3d at 1167–68; *Lamb v. Thompson,* 265 F.3d 1038, 1042 (10th Cir.2001).

## B. Sustainability

36. Plaintiffs assert that the project-specific EAs for the timber sales are deficient for failing to adequately address the Forest-wide issue of sustainable timber harvest. The Tenth Circuit has determined that this Forest-wide issue can be challenged in the context of a single timber sale. *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1217 (10th Cir.1997). However, the Circuit concluded, after reviewing the relevant facts (which are virtually identical to the facts at issue here), that the USFS was not arbitrary and capricious in proceeding with the Banner timber sale on the MBNF. *Id.* The Circuit held that where the historic volume of timber sold by 1995 was only 62% (175mmbf/284mmbf) of the decadal Allowable Sale Quantity, a sale of 3.1 million board feet did not "implicate[ ] sustainable yield concerns." *Id.* at 1218.

37. The Tenth Circuit also discredited the same Timber Supply and Demand Study which is cited by Plaintiffs in the case at bar, and found that it was neither new nor significant information. *Friends of the Bow,* 124 F.3d at 1219. The only difference in the present case versus *Friends of the Bow* is that the three sales challenged here were authorized through Decision Notices in 1996, 1998 and 2000. AR at 4547, 5035, 4875. Since 1994, the USFS has only sold about one quarter of the annual Allowable Sale Quantity for the MBNF, averaging 4.8 million board feet per year between 1994 and 2001 compared to an annual ASQ of 28.4 million board feet per year. Tr. at 405–407; Govt. Ex. F. The USFS has given the sustained yield

issue the limited attention it merited. *See e.g.,* AR at 4986, 5005.

38. Given the arbitrary and capricious standard of review and the fact that the USFS considered many aspects of the allegedly new and allegedly significant information both at the forest-wide level and at the site specific level, a hard look at the environmental effects of the new information was taken and it was not necessary to supplement the 1985 programmatic EIS prior to completing the EIS for the plan revision, particularly for the Jack Creek 3 sale.

## C. The Forest Service Took a "Hard Look" at the Environmental Impacts of the Jack Creek # 3 Timber Sale

39. Based upon the Findings of Fact, the Court concludes that the USFS took a hard look at the environmental effects of the JC3 Timber Sale as required by NEPA regarding the issues of fragmentation, sensitive species, and wildlife viability.[4] To the extent these issues involve new information, that information was adequately considered in preparing the JC3 timber sale.

40. For the Jack Creek project the USFS prepared an EA (AR at 4888–5034), a Decision Notice and FONSI (AR at 5035–50), a specialist's report for ecology and wildlife (AR at 5620–61), a biological evaluation for listed and sensitive reptile, bird, mammal, and plant species (AR at 5662–5712), a fisheries specialist report (AR at 6287–95), a biological evaluation for amphibian species (AR at 6296–98), a supplemental biological assessment for mountain plover and biological evaluation for

---

4. As to NFMA, the Court finds that the 15-year period in 16 U.S.C. § 1604(f)(5)(A) does not apply to the Jack Creek 3 decision because the Decision Notice was signed January 13, 2000 (AR at Vol. 12 at 5050) before 15-year anniversary of adoption of the Medicine

Bow Plan on November 20, 2000. Because the Jack Creek Record of Decision authorizes the timber sale, it is the Record of Decision date rather than the contract award date that is relevant to the NFMA plan revision issue.

wolverine (AR at 6299–6306), and a supplemental biological assessment for Canada lynx (AR at 6270–6286).

### 1. Fragmentation

■ 41. Neither NFMA nor NEPA impose a substantive requirement regarding fragmentation. NFMA and its regulations do impose restrictions on clearcutting. First, the size of clearcuts are limited to 40 acres on the MBNF. *See* 36 C.F.R. 219.27(d)(2). Second, clearcutting is permitted only when it is determined to be the optimum method of timber harvest. 16 U.S.C. 1604(g)(3), (f)(i). Third, a clearcut must not be located next to openings and "openings in forest stands are no longer considered openings once a new forest is established." 36 C.F.R. § 219.27(d)(1).

42. In designing the clearcuts for the JC3 sale, the USFS has complied with NFMA because the cuts are less than 40 acres (*see* ex. I–33 at par. AT3, clearcut units average less than 20 acres; AR at 4905, map of units), the adjacent forest is no longer considered an opening because a young lodgepole pine forest is successfully established in the Jack Creek area (Tr. at 511), and the USFS determined that clearcutting in the JC3 area was optimum because it was a scientifically sound method to regenerate lodgepole pine and aspen. AR at 5030. Clearcutting, as well as overstory removal, will be used to maintain and promote aspen in the sale area. AR at 4902; Tr. at 422–23. Most of the current aspen in the watershed originated because of timber harvest. AR at 4965.

■ 43. The record supporting the Jack Creek EA met NEPA procedural requirements by extensively discussing fragmentation and its effects. The BE notes that "fragmentation has been de-

scribed in several ways, and the definition of fragmentation is currently a subject of considerable debate." AR at 5679, 5683–85 (describing studies related to fragmentation.[5]) The EA contains a thorough discussion of fragmentation and clearcuts. AR at 4965–67. Both the BE and EA discuss the Baker study regarding the existing fragmentation on the MBNF. AR at 4965, 5680–81. The BE discusses Baker's study's protection and silvicultural options to counter fragmentation and restore the landscape to its range of natural variability. AR at 5680.

44. The EA also noted recommendations from scientists and research wildlife biologists from the University of Wyoming Zoology Department and Forest Science Laboratory that in a managed forest, it was good to combine new and old harvest units to increase the patch size of forest in younger age classes so that as they mature, they will provide larger blocks of habitat in the future. AR at 5011. The fragmentation issue was instrumental to the design of the JC3 Timber Sale. *Id.* The preferred alternative identified seven specific areas in which harvest units would be concentrated to "begin the conversion of these areas, through a series of entries, from the existing, fragmented collection of stands into a future block of young lodgepole-aspen trees that are similar in species, age, and structure." *Id.* at 4942.

44. Because the proposed harvest units of the JC3 timber sale are adjacent to old harvest units, limited new road construction is required on the timber sale—1.5 miles of reconstruction and 0.6 miles of new construction in short segments from existing roads. AR at 5777. The new roads are to be closed following the completion of the sale. AR at 4906; Tr. at 488, 605, 607. To reduce fragmentation,

---

**5.** Consistent with the biological evaluation, Dr. Baker testified it was difficult to say what is the ecologically acceptable size of an interi-

or forest patch or what effect the influence of roads in the Jack Creek area has on interior forest. Tr. at 273–75.

the MBNF staff is working toward reducing the amount of roads on the forest. Tr. at 420. Approximately 1.3 miles of roads which are currently open to the public would be closed and obliterated. AR at 4902, 4904.

45. The concentration of proposed harvest units near the existing regenerated harvest units avoided harvest in roadless areas at the southern end of the Jack Creek analysis unit. The Jack Creek EA contains no cutting in the RARE II roadless area. AR at 4970. There was no testimony at the hearing indicating that harvest was planned in the roadless area and additional environmental analysis would have to occur before action within the roadless area. Tr. at 446–47, 530.

46. The USFS complied with the procedural requirements of NEPA in considering the fragmentation issue. NEPA does not dictate substantive environmental results but only prescribes the necessary process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350–51, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989).

### 2. Sensitive Species and Viability

■ 47. The Jack Creek EA also took a hard look at the effects of the timber sale on sensitive species and viability. The environmental analysis considered sensitive species list prepared by the Regional Forester in 1993 following adoption of the MBNF Plan. AR at 4930. The BE for the Jack Creek EA contains a list of the sensitive species. AR at 5670–72. The USFS also obtained from the U.S. Fish and Wildlife Service a list of threatened, endangered, and candidate species which may occur on the MBNF and the Thunder Basin National Grasslands. AR at 5670. The USFS followed up with the Fish and Wildlife Service to narrow the list to those species that occurred or could potentially

occur within the project area. *Id.* This review concluded that there were no threatened, endangered, or candidate species known to occur on the Brush Creek/Hayden District. *Id.*

48. The USFS assessed the presence of species in the sale area using three methods. One method was to assess whether species were likely to occur in the area based upon habitat or forest type preferences. For example, the boreal owl prefers high elevation, old growth, spruce-fir forests—which are not proposed for harvest in the timber sale. AR at 5706. Second, the USFS used occurrence information from other reputable sources. For example, for the Clustered Lady's slipper, the USFS relied on the Wyoming Natural Diversity Data Base from the Nature Conservancy which confirmed known populations of the plant in some drainages of the Brush Creek, Laramie, and Hayden districts, but there were no known populations in the analysis area. AR at 5693, 5712. The USFS also provided inventory field crews with photographs and a description of potential Clustered Lady's slipper locations. Govt. Ex. DD; Tr. at 610–11. Third, the USFS conducted surveys for some species—such as the goshawk. AR at 4959, 4970, 5704.

49. The BE considers each of the species that occur or are likely to occur in the analysis area, and their habitat requirements, distribution, and ecological needs relative to condition in the analysis area. AR at 5700–12. The EA summarizes and explains the analysis of sensitive species. AR at 4930.

50. In Plaintiffs' filings with the Court and at the hearing, concerns were raised about the adequacy of the analysis for various wildlife species. The Court finds that the Jack Creek EA adequately analyzed the effects on these species.[6]

---

**6.** Plaintiffs have raised no claim under NFMA

that the timber sale threatens the viability of

51. For the goshawk, the USFS conducted raptor surveys and all stands containing known goshawk nests were avoided in designing the JC3 sale. AR at 4959, 4970, 5704. Goshawks use younger pole size stands for foraging and need an open understory to maneuver to obtain prey. *Id.* In 1998, the U.S. Fish and Wildlife Service rejected the goshawk for listing as a threatened or endangered species, finding no evidence that goshawk habitat is limiting the population. 63 Fed.Reg. 35183, 35184 (June 29, 1998).

■ 52. For the lynx, the USFS prepared a supplemental BE which assumed that all forested area was lynx habitat. AR at 6270–86. The USFS consulted with the Fish and Wildlife Service regarding the effect of the timber sale on lynx. AR at 6269. Based on historic records and field visits, the USFS determined there were no lynx present in the analysis area. AR at 6273, 6276. There were two historical observations of lynx thirty miles from the analysis area. *Id.* at 6273. The lack of species' presence in the analysis area supports a limited analysis of the species. *Colorado Envtl. Coalition v. Dombeck,* 185 F.3d 1162 (10th Cir.1999).

53. The USFS concluded that pine marten use primarily spruce-fir and to a lesser degree, lodgepole pine for foraging and cover. AR at 4931. The USFS concluded that "none of the areas that provide optimal pine marten habitat are included in the proposed action" (AR at 4970), as the most important habitat for marten is the spruce-fir stands at higher elevations in the southern part of the sale and no spruce-fir forest would be harvested. AR at 5958. Less than 10% of the timber volume in the JC3 timber sale is spruce-fir (Ex. H; I–33; AR at 5773) and the spruce-fir volume in the sale occurs scattered in

mixed species stands that will be thinned rather than clearcut. Tr. at 731–32.

54. The USFS prepared a separate fishery specialist report for the Jack Creek timber sale EA on the boreal toad. AR at 6287–95. The report was designed to maintain "the habitat integrity and population viability of the boreal toads that may occur in the analysis area." AR at 6288. The USFS used amphibian surveys, riparian condition surveys, and wetland inventory maps to identify potential amphibian habitat. *Id.* Field reconnaissance and amphibian surveys were conducted. *Id.* No wetlands are subject to logging or road construction. AR at 6290–91. Timber harvest may actually benefit boreal toad and other amphibians by increasing water yield and the growth of vegetation near streams through the additional light created. This can increase the insects that comprise the amphibian food supply. AR at 6290, 6292. Finally, if during logging, monitoring finds the presence of egg masses or tadpoles indicating toad breeding habitat, the areas will be further protected. AR at 6293.

55. The EA used the Habitat Capability ("HABCAP") model to assess effects of the timber sale on the various wildlife species. AR at 4930. While the HABCAP model has limitations, the EA acknowledged these limitations:

> "The model is currently unable to incorporate spatial considerations into the analysis, therefore these considerations must be made by the biologist while interpreting the quality and distribution of habitats."

AR at 4930.

56. The USFS displayed habitat capability for the relevant sensitive and management indicator species. AR at 4930–31.

wildlife species and there was no evidence presented at the hearing that the JC3 timber

sale would prevent the USFS from maintaining wildlife species viability.

The HABCAP model is used throughout Forest Service Region 2 which includes South Dakota and Wyoming. AR at 4930. The USFS's use of the HABCAP model elsewhere in Region 2 has been upheld by various courts. *Sierra Club v. United States Forest Service*, 878 F.Supp. 1295, 1308–10 (D.S.D.1993), *aff'd*, 46 F.3d 835 (8th Cir.1995).

57. The EA discloses that there will likely be a decrease in populations for species that require more closed habitat such as the red breasted nuthatch, golden-crowned kinglet, and the brown creeper. AR at 4971. In contrast, there will likely be increases in a number of species that require more open habitat. *Id.* Following a review of the ecological needs of the various species and an evaluation of the proposed action, the USFS expert biologist concluded that "the proposed action and the action alternatives to the proposed action may adversely impact individuals, but are not likely to result in a loss of viability on the Planning Area or cause a trend to federal listing or loss of species viability rangewide." AR at 6297. This conclusion is supported by the record and the USFS is to rely on their own experts so long as their decisions are not arbitrary and capricious. *Colorado Envt'l Coalition*, 185 F.3d at 1173 n. 12.

58. Plaintiffs have not raised the issue of population data and management indicator species as a claim in their Second Amended Complaint. Nevertheless, the record reflects the USFS fully considered the effects of the timber sales at issue in this case on management indicator species.

59. Though the Court finds that USFS missed the statutory deadline in NFMA for revision of the 1985 MBNF Plan as discussed above, the remedy for such violation need not be as drastic as a permanent injunction as to any USFS's actions taken with some reliance on the Plan. The USFS complied with NEPA in its design

and review of the JC3 timber sale. Therefore, Plaintiffs' claims as they relate to violations of NEPA are **DENIED**.

### III. *Five Year Timber Sale Action Plans*

60. The USFS issued two documents entitled Five Year Timber Sale Action Plans. Plaintiffs' request that the Court declare that the development, implementation and modification of the two Five Year Timber Sale Action Plans for the MBNF without providing opportunities for public participation in its development and modification and without preparing a new or supplemental programmatic EIS constitutes violations of NFMA, NFMA regulations, NEPA, NEPA regulations, and constitutes conduct that is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law—Plaintiffs' claims must be denied. Aside from a bald statement in their Second Amended Complaint that they have exhausted administrative remedies, Plaintiffs fail to ever substantiate this claim. It is, of course, axiomatic that a litigant must exhaust his administrative remedies, if such remedies exist, as a prerequisite to invoking the jurisdiction of the federal court. *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). This Court cannot review "issues that have not been passed on by the agency … whose action is being reviewed." *New Jersey v. Hufstedler*, 724 F.2d 34, 36 n. 1 (3d Cir.1983), rev'd on other grounds, 470 U.S. 632, 105 S.Ct. 1555, 84 L.Ed.2d 572 (1985). Federal courts do not consider the myriad of issues raised in a complaint without the benefit of the agency's expert input so as to: (1) avoid "premature interruption of the administrative process," (2) allow the agency to "develop the necessary factual background," (3) give the agency the "first chance" to exercise its discretion, (4) prop-

erly defer to the agency's expertise, (5) provide the agency with an opportunity "to discover and correct its own errors," and (6) deter the "deliberate flouting of administrative processes." *McKart v. United States*, 395 U.S. 185, 194–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Moreover, a court "usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented" to the agency. *Unemployment Compensation Commission v. Aragon*, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946).

The U.S.D.A. Reorganization Act of 1994, section 212(e) provides that "a person shall exhaust all administrative appeal procedures established by the Secretary or required by law before the person may bring an action in a court of competent jurisdiction against (1) the Secretary; (2) the Department; or (3) an agency, office, officer, or employee of the Department." 7 U.S.C. § 6912(e). Importantly, 36 C.F.R. § 215.20 advises that "unless waived in a specific case, it is the position of the Department of Agriculture that any filing for Federal judicial review of a decision subject to review under this part is premature and inappropriate unless the plaintiff has first sought to invoke and exhaust the procedures available under this part."

■ 61. In the case at bar, Plaintiffs have not properly presented their challenge to the Five Year Timber Sale Action Plans to the USFS. Therefore, they have not exhausted their administrative remedies, and these claims are not properly before this Court.

■ 62. Additionally, Plaintiffs challenge these Plans under the APA as arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). However, in order for an action to be challenged under the APA, it must constitute final agency action. *Heckler v. Chaney*, 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). The APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Colorado Farm Bureau Federation v. USFS*, 220 F.3d 1171, 1173 (10th Cir.2000), quoting 5 U.S.C. § 551(13). Issuing these Plans does not fit within the APA definition of an agency "action."

In order to determine if an agency action is final, the Tenth Circuit has said that a court shall look to whether its impact is direct and immediate, whether the action marks the consummation of the agency's decisionmaking process, and whether the action is one by which rights or obligations have been determined, or from which legal consequences will flow. *Id.* The issuance of the Plans does not satisfy these three requirements. The Plans are merely a general outline, and before any of the sales mentioned in the Plans can go forward, significant environmental analyses must be performed. Therefore, this Court will not review Plaintiffs' challenge to the two Five Year Timber Sale Action Plans as Plaintiffs have not exhausted their administrative remedies, and the Plans are neither an agency "action," nor are they "final."

63. Therefore, Plaintiffs' claims as they relate to the two Five Year Timber Sale Action Plans are **DENIED**.

## IV. Failure to Exhaust Administrative Remedies as to Various Other Claims

64. As discussed above, Plaintiffs are obligated to exhaust administrative remedies. United States Department of Agriculture Reorganization Act of 1994, 7 U.S.C. § 6912(e); *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938).

■ 65. Leila Bruno, an individual Plaintiff here, was not a party to the ad-

ministrative appeals filed by Plaintiffs Biodiversity Associates and Friends of the Bow, and Leila Bruno has therefore failed to exhaust her administrative remedies as required by law, and is dismissed from the case.

66. Plaintiffs have failed to exhaust their administrative remedies as to their claim that defendants' failure to review the 1985 programmatic EIS at least once every five years violates NEPA and NEPA regulations in the Forest Service Handbook.

67. As also discussed above, Plaintiffs have failed to exhaust their administrative remedies as to their claim that defendants have violated the NFMA and NFMA regulations by failing to demonstrate that the Five Year Timber Sale Action plan developed for the Medicine Bow will 1) provide for "multiple use," 2) ensure a sustained yield of timber harvest, 3) ensure proper coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness, and 4) provide sufficient latitude to make periodic adjustments in use to conform to changing needs and conditions.

68. As also discussed above, Plaintiffs have failed to exhaust their administrative remedies as to their claim that defendants have violated the NFMA and NFMA regulations by failing to determine for the Five-Year Timber Sale Action Plan what specific forest management systems, harvesting levels, and procedures are appropriate to provide for harmonious coordination of the multiple uses and a sustained yield of timber harvest.

69. Plaintiffs have failed to exhaust their administrative remedies as to their claim that defendants have violated NEPA and NEPA regulations by failing to issue any legally adequate amendments to the 1985 MBNF Plan or programmatic EIS that would address the "problem areas, inadequacies, changes, and new informa-

tion" identified by the 1990 Special Review Team Report, the 1991 New Direction for the '90's Document, the 1992 Five-Year Review, the 1992 Monitoring Report, or Plaintiffs' comments and administrative appeals.

70. As to the Bird Creek sale, Plaintiffs have failed to exhaust their administrative remedies as to their claims that Defendants have unlawfully withheld or unreasonably delayed the following agency actions: 1) to revise, amend, correct, or supplement the 1985 programmatic EIS to account for the development of the Five-Year Timber Sale Action Plan, changed circumstances, significant new information, the 1990 Special Review Team Report, and problems identified in the 1992 Five Year Review; 2) to conduct a timely interdisciplinary review of the changed circumstances and significant new information relevant to impacts of the MBNF timber harvesting program; document the results of such review; and make a timely determination on whether this information warrants correction, supplementation, or revision of the 1985 programmatic EIS; 3) to conduct a review of the 1985 programmatic EIS at least once every 5 years—to determine if that EIS should be corrected, supplemented, or revised; 4) to determine in a timely way whether or not the harvest level and allowable sale quantity prescribed in the 1985 Plan is sustainable in light of new information and changed circumstances that emerged since the 1985 Forest Plan and 1985 EIS were adopted; and 5) to assess how the acreage of lands that are suitable for timber harvest was reduced by changing in 1994 from an unlawful 7-year restocking standard to a 5-year restocking standard required by NFMA.

71. As to the JC3 and Joes Park sales, Plaintiffs have failed to exhaust their administrative remedies as to their claim that

Defendants have unlawfully withheld or unreasonably delayed the following agency action: 1) to conduct a timely interdisciplinary review of the changed circumstances and significant new information relevant to impacts of the MBNF timber harvesting program; document the results of such review; and make a timely determination on whether this information warrants correction, supplementation, or revision of the 1985 programmatic EIS; or 2) to conduct a timely interdisciplinary review of the changed circumstances and significant new information relevant to impacts of the MBNF timber harvesting program; document the results of such review; and make a timely determination on whether this information warrants correction, supplementation, or revision of the 1985 programmatic EIS.

72. Therefore, the Court need not consider these claims, and they are hereby **DENIED**.

### V. *Permanent Injunction*

73. As explained fully above, although the USFS has failed to timely revise the 1985 MBNF Plan, the correct remedy for their failure is not a permanent injunction against all USFS actions that relate thereto. Therefore, Plaintiffs' request for injunctive relief as to the JC3 and Fall Creek/Bird Creek and any other pending actions based thereon is **DENIED**.

### VI. *Administrative Procedure Act Claims*

74. The Court finds that it would be a waste of judicial resources to not address the effect of the USFS's failure to revise the 1985 MBNF Plan within the time limits set out by NFMA, as more fully discussed above, since Sec. 327 which grants the USFS further time to finish the revision will expire October 1, 2002. To the extent that this action addresses the USFS's failure to timely revise the 1985 MBNF Plan and programmatic EIS as

agency action unlawfully withheld or unreasonably delayed pursuant to 5 U.S.C. § 706(1)(generally, the "APA"), the Court finds that upon the expiration of Sec. 327, the USFS will be in violation of 5 U.S.C. § 706(1), as it has unlawfully withheld a revision of the 1985 MBNF Plan pursuant to the timeline set out in NFMA, 16 U.S.C. 1604(f)(5)(A). Therefore, it behooves the USFS to timely revise the 1985 MBNF Plan and programmatic EIS whether or not Congress grants another extension such as that found in Sec. 327. Further delay is hereinafter inexcusable. Therefore, the USFS is **HEREBY ORDERED**, after October 1, 2002, to adhere to the timeline for revision that it has put before this Court. *See* Findings of Fact 53; Tr. at 388–89; Govt. Ex. E.

75. All other claims in this case are **HEREBY DISMISSED AS MOOT**.